The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
December 31, 2020

## 2020COA176

**No. 19CA0512, *Redden v. Clear Creek Skiing Corporation* —
Contracts — Exculpatory Agreements; Professions and
Occupations — Public Tramways; Parks and Wildlife — Ski
Safety and Liability — Ski Safety Act of 1979**

A division of the court of appeals considers whether ski area
operators can, by means of exculpatory agreements, protect
themselves from lawsuits arising from the alleged negligence of their
employees.  At issue in this case is the validity of two exculpatory
agreements — one in connection with a purchase of ski equipment,
the other on the back of a lift ticket — purporting to bar claims by a
skier injured while getting off a ski lift.

A majority of the division concludes that the exculpatory
agreements are not only valid under *Jones v. Dressel,* 623 P.2d 370
(Colo. 1981), but that they also do not undermine public policies

underlying the Colorado Passenger Tramway Safety Act, sections 12-150-101 to -120, C.R.S. 2020, and the Ski Safety Act of 1979, sections 33-44-101 to -114, C.R.S. 2020.  One member of the division concludes that the exculpatory agreements violate the public policies underlying these statutes.

Court of Appeals No. 19CA0512
Clear Creek County District Court No. 18CV30003
Honorable Wayne Patton, Judge

Charlotte Redden,

Plaintiff-Appellant,

v.

Clear Creek Skiing Corporation,

Defendant-Appellee.

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE DAILEY
Hawthorne*, J., concurs
Davidson*, J., concurs in part and dissents in part

Announced December 31, 2020

Levin Sitcoff, P.C., Bradley A. Levin, Nelson A. Waneka, Susan S. Minamizono, Denver, Colorado, for Plaintiff-Appellant

The Rietz Law Firm, L.L.C., Kimberly A. Viergever, Brian A. Birenbach, Dillon, Colorado, for Defendant-Appellee

Leventhal Puga Braley, P.C., Timothy J. Luetkemeyer, Bruce L. Braley, Denver, Colorado, for Amicus Curiae Colorado Trial Lawyers Association

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2020.

¶ 1     Skiing is one of our state's biggest tourist activities and supports not only the ski area operators but also businesses that provide services (e.g., food, lodging, entertainment) for skiers.  But it is also a common source of injury.

¶ 2     In this case, we address whether ski area operators can, by using exculpatory agreements, protect themselves from personal injury lawsuits arising from the alleged negligence of their employees.  Because we determine that they may protect themselves in this manner, we affirm the district court's entry of summary judgment in favor of defendant, Clear Creek Skiing Corporation (Clear Creek), and against plaintiff, Charlotte Redden.

*I.     Background*

¶ 3     Clear Creek owns the Ptarmigan ski lift at, and has operational responsibility for, the Loveland Ski Area.[1]  Redden, an experienced skier living in Colorado, was hurt as she attempted to get off that lift.  Unbeknownst to her, a skier on the chair ahead of her had fallen while getting off the lift.  When Redden tried to get off her chair by standing up at the top of the exit ramp, she saw — but

---

[1] Clear Creek is referenced in the record as doing business as "Loveland Ski Area."

had no way of navigating around — the fallen skier. Because the employee operating the lift did not slow or stop the lift, Redden's chair knocked her down, injuring her.

¶ 4    Redden brought the present action against Clear Creek, asserting claims for negligence and negligence per se under, as pertinent here, the Colorado Passenger Tramway Safety Act (the PTSA), sections 12-150-101 to -120, C.R.S. 2020, and the Ski Safety Act of 1979 (the SSA), sections 33-44-101 to -114, C.R.S. 2020.[2]

¶ 5    Clear Creek moved for summary judgment based on two exculpatory agreements: one Redden signed nearly a year before the incident when she purchased a pair of ski boots and had her ski bindings adjusted at Clear Creek's ski shop (signed waiver), and

---

[2] Redden also initially grounded her claims on the Premises Liability Act (the PLA), section 13-21-115, C.R.S. 2020. However, when Clear Creek pointed out that the PLA abrogates common law claims for negligence, Redden responded that the SSA takes priority over the PLA and permits "common law negligence" actions, relying on *Calvert v. Aspen Skiing Co.,* 700 F. Supp. 520, 522 (D. Colo. 1988). However, she does not rely, in any respect, on the PLA on appeal.

another unsigned one consisting of a series of disclaimers listed on the back of her lift ticket (ticket waiver).[3]

¶ 6     The signed waiver was titled "RELEASE of LIABILITY, and INDEMNIFICATION AGREEMENT." In its first paragraph, the signed waiver defined a term it would use — "ACTIVITY" — as including "using ski area facilities, including the lifts." In accord with Colorado statutes, it advised the purchaser of equipment that, by law, a skier voluntarily assumes the risk of injury in connection with certain inherent dangers and risks of skiing. It then provided,

---

[3] She had purchased her ticket at a discount as part of a "4-Pak." Notably,

> Colorado law permits contracts to be formed without the signatures of the parties bound by them. *See Yaekle v. Andrews*, 195 P.3d 1101, 1107 (Colo. 2008) (noting that "common law contract principles . . . allow for the formation of contracts without the signatures of the parties bound by them"); *see also Feeney v. Am. W. Airlines*, 948 P.2d 110, 113 (Colo. App. 1997) ("[N]o such signature or other method of acknowledgment was required to accept the . . . terms. Plaintiffs accepted the terms of the travel contract by accepting and using the passenger tickets.").

*Patterson v. PowderMonarch, LLC*, 926 F.3d 633, 638 n.3 (10th Cir. 2019).

5. . . . . THE UNDERSIGNED acknowledge and understand that a skier **ASSUMES THE RISKS of the inherent dangers and risks of skiing**. THE UNDERSIGNED recognize that falls and collisions occur and injuries are a common and ordinary occurrence of the ACTIVITY. THE UNDERSIGNED hereby VOLUNTARILY **ASSUME ALL RISKS** associated with the PURCHASER'S participation in the ACTIVITY and use of this equipment.

6. Additionally, THE UNDERSIGNED **HEREBY AGREE TO HOLD HARMLESS, RELEASE, DEFEND, AND INDEMNIFY** Clear Creek Ski Corporation d/b/a Loveland Ski Areas, the equipment manufacturers and distributors, their successors in interest, their affiliated organizations and companies, and each of their respective insurance carriers, agents, employees, representatives, assignees, officers, directors, and shareholders (each hereinafter a "RELEASED PARTY") for **ANY AND ALL LIABILITY** and/or claims for injury or death to persons or damage to property arising from the PURCHASER's use of this equipment, **including those claims based on any RELEASED PARTY's alleged or actual NEGLIGENCE OR BREACH OF any express or implied WARRANTY**.

7. THE UNDERSIGNED take full responsibility for any injury or loss to PURCHASER, including death, which PURCHASER may suffer, arising in whole or in part out of the ACTIVITY. By signing this release, THE UNDERSIGNED **AGREE NOT TO SUE** any RELEASED PARTY and agree they are **releasing any right to** make a claim or **file a**

**lawsuit** against any RELEASED PARTY. THE UNDERSIGNED further **AGREE TO DEFEND AND INDEMNIFY** each RELEASED PARTY for any and all claims of THE UNDERSIGNED and/or a THIRD PARTY arising in whole or in part from the PURCHASER's use of this equipment and/or PURCHASER's participation in the ACTIVITY. THE UNDERSIGNED agree to pay all costs and attorney's fees incurred by any RELEASED PARTY in defending a claim or suit brought by or on behalf of THE UNDERSIGNED.

¶ 7    The ticket waiver provided, "HOLDER AGREES AND UNDERSTANDS THAT SKIING, SNOWBOARDING, AND USING LOVELAND SKI AREA, INCLUDING ITS LIFTS, FOR ANY PURPOSE CAN BE HAZARDOUS." Then, after warning the ticket holder that, by law, "a skier assumes the risks of any injury . . . resulting from any of the listed inherent risks of skiing,"[4] the ticket waiver provided:

> Holder understands that he/she is responsible for using the ski area safely and for having physical dexterity to safely load, ride, and unload the lifts . . . . In consideration of using

---

[4] Sections 33-44-103(3.5) and -107(8)(c), C.R.S. 2020, require lift ticket warnings notifying skiers that they assume the risk of injury from a host of hazards, specifically including "[c]hanging weather conditions; existing and changing snow conditions; bare spots; rocks; stumps; trees; collisions with natural objects, man-made objects, or other skiers; variations in terrain; and the failure of skiers to ski within their own abilities."

the premises, Holder agrees to ASSUME ALL RISKS associated with the activities and to HOLD HARMLESS Loveland Ski Area and its representatives for all claims to injury to person or property.

¶ 8 In her response to Clear Creek's motion for summary judgment, Redden asserted that the two exculpatory agreements were unenforceable because (1) the signed waiver was not fairly entered into; (2) the two agreements did not clearly and unequivocally evidence an intent to waive a claim of negligence against Clear Creek; and (3) they were contrary to the public policy expressed in the SSA and PTSA.

¶ 9 In a written order, the district court rejected Redden's arguments and granted summary judgment for Clear Creek.

¶ 10 Redden now appeals.

## II. The District Court Properly Granted Summary Judgment for Clear Creek

¶ 11 Redden contends the district court erred by entering summary judgment for Clear Creek. We disagree.

¶ 12 Summary judgment is appropriate if the pleadings and supporting documents establish that there is no genuine issue of material fact and judgment should be entered as a matter of law.

C.R.C.P. 56(c); *Stone v. Life Time Fitness, Inc.*, 2016 COA 189M, ¶ 8. We review a summary judgment ruling de novo. *Hamill v. Cheley Colo. Camps, Inc.*, 262 P.3d 945, 948 (Colo. App. 2011).

¶ 13 Here, the court granted summary judgment based solely on the exculpatory agreements, the validity of which is a question of law that we review de novo. *Id.*; *see Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1264 (Colo. App. 2010).

¶ 14 Exculpatory agreements purporting to shield a party from liability for its own simple negligence are disfavored. *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 783 (Colo. 1989). However, they are not necessarily void. *Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 726 (Colo. 2010); *Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 467 (Colo. 2004). They stand at the crossroads of two competing principles — freedom of contract and responsibility for damages caused by a party's negligent acts. *Heil*, 784 P.2d at 784.

¶ 15 On appeal, Redden contends that the exculpatory agreements were invalid (1) under *Jones v. Dressel*, 623 P.2d 370, 373 (Colo. 1981) and (2) because they undermine public policies underlying the PTSA and SSA. We address — and reject — these contentions in turn.

*A.    The Exculpatory Agreements are Valid under Jones v. Dressel*

¶ 16    Exculpatory agreements are closely scrutinized under four factors (the *Jones* factors) to determine whether they are valid: "(1) the existence of a duty to the public; (2) the nature of the service performed; (3) whether the contract was fairly entered into; and (4) whether the intention of the parties is expressed in clear and unambiguous language." *Jones*, 623 P.2d at 376.

¶ 17    The first two factors focus on public policy questions, asking whether the service provided is of "great importance to the public" or is a matter of "practical necessity," as opposed to (among other things) a recreational one. *Id.* at 376-77 (citation omitted). The latter two factors focus, respectively, on the agreement's fairness and clarity.

*1.    The First Two Jones Factors*

¶ 18    For good reason Redden does not contest the district court's conclusion that the exculpatory agreements were not objectionable based on the first two *Jones* factors: "Although skiing is a recreational activity enjoyed by many, by definition and common sense, it is neither a matter of great public importance nor a matter of practical necessity." *Bauer v. Aspen Highlands Skiing Corp.*, 788

8

F. Supp. 472, 474 (D. Colo. 1992) (applying *Jones*); *accord Patterson v. PowderMonarch, LLC*, 926 F.3d 633, 639 (10th Cir. 2019) (concluding skiing satisfies the first two *Jones* factors); *Brigance v. Vail Summit Resorts, Inc.*, 883 F.3d 1243, 1250-53 (10th Cir. 2018) (same); *Raup v. Vail Summit Resorts, Inc.*, 734 F. App'x 543, 546 (10th Cir. 2018) (same); *Rumpf v. Sunlight, Inc.*, No. 14-CV-03328-WYD-KLM, 2016 WL 4275386, at *1-4 (D. Colo. Aug. 3, 2016) (unpublished opinion) (applying *Jones*); *Squires v. Goodwin*, 829 F. Supp. 2d 1062, 1073 (D. Colo. 2011) (noting the parties did not dispute that skiing "is a recreational service, not an essential service"), *aff'd sub nom. Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867 (10th Cir. 2013).

## 2. The Third Jones Factor

¶ 19    "With respect to the third factor, a contract is fairly entered into if one party is not at such an obvious disadvantage in bargaining power that the effect of the contract is to place that party at the mercy of the other party's negligence." *Stone*, ¶ 18. Because recreational activities like skiing are not essential activities, Clear Creek did not possess a decisive advantage of bargaining strength that put participants "at the mercy" of any

9

negligence committed by it. *See Jones*, 623 P.2d at 377-78 ("[B]ecause the [skydiving] service provided . . . was not an essential service," the defendant "did not possess a decisive advantage of bargaining strength over" the plaintiff.); *Hamill*, 262 P.3d at 949-50 ("Because horseback riding is not an essential activity, [the plaintiff's] mother was not 'at the mercy' of [the defendant's] negligence when signing the agreement."); *see also Mincin v. Vail Holdings, Inc.*, 308 F.3d 1105, 1111 (10th Cir. 2002) (because mountain biking is not a "practical necessity" or an "essential activity," the participant "did not enter into the contract from an inferior bargaining position" and the contract was not unfair); *Raup v. Vail Summit Resorts, Inc.*, 233 F. Supp. 3d 934, 943 (D. Colo. 2017) ("[R]iding a chairlift is not an essential activity but is recreational in nature, and recreational activities 'd[o] not possess a decisive advantage of bargaining strength that puts participants 'at the mercy' of any negligence by the recreational company." (quoting *Hamill*, 262 P.3d at 949)), *aff'd*, 734 F. App'x 543 (10th Cir. 2018).

¶ 20    Nonetheless Redden asserts that the agreements were not fairly entered into because it's unfair (1) "to hold a person's property hostage until they sign a waiver"; (2) to sell, through the mail, an

expensive, nonrefundable ticket, only to learn that it includes "release language in tiny print on the back . . . that forces the purchaser to either waive their rights or forfeit their money"; and (3) to "sn[ea]k" broad language exculpating Clear Creek as a whole into an agreement centered around Redden's purchase of boots and an adjustment of her bindings. We are not persuaded.

¶ 21    As to Redden's first point, she says nothing in her opening brief beyond (1) what was said above and (2) one additional sentence — "After the boots had been adjusted [in the ski shop], and *apparently* in order to take possession of them, Redden was required to sign a waiver . . . ." (Emphasis added.) She neither cites any authority nor attempts to develop any cogent argument on this point. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."); *People v. Hicks*, 262 P.3d 916, 920 (Colo. App. 2011) (declining to address contention "because [the] defendant has neither articulated a cogent argument for review nor provided supporting legal authority"). In any event, as noted by Clear Creek, Redden proffered no evidence that her boots were "held hostage" or

that she ever attempted to reverse the boot/adjustment transaction. *Cf. CSX Transp., Inc. v. Miller*, 858 A.2d 1025, 1083 (Md. Ct. Spec. App. 2004) ("If [the party] wanted a weightier resolution of the issue, it should have mounted a weightier contention.  Gravitas begets gravitas.").

¶ 22     As to Redden's second point, she made no argument about the effect of a nonrefundable ticket in the district court.[5]  Consequently,

---

[5] As to Redden's "tiny print" assertion, the district court rejected it as a basis for invalidating the agreement, finding that

> [t]he language as printed on the back of the paper ticket is quite small, however, it may be read without resorting to a magnifying glass. *Stone v. Life Time Fitness*[,] *Inc.*, 411 P.3d 225 (Colo. App. 2016) (finding that a "provision that would exempt its drafter from liability occasioned by his fault should not compel resort to a magnifying glass and lexicon."[).]

Based on our review of the copies of the agreements in the record, we perceive no basis upon which to disturb the court's ruling.  *See Raup v. Vail Summit Resorts, Inc.*, 734 F. App'x 543, 548 (10th Cir. 2018) ("In other words, a waiver provision must be accessible to a customer who wishes to read it.  It should be legible without resort to a special device (that is, a device unlikely to be readily available), and it should be readily comprehensible by a layperson."); *see also Patterson*, 926 F.3d at 642 ("While the font size is small, it is certainly readable, and key phrases are . . . capitalized . . . to attract the reader's attention to the release of liability and other critical information.").  In any event, as will be shown later, Redden was familiar with the agreement language.

12

we need not address it.  *See Adams Reload Co. v. Int'l Profit Assocs., Inc.,* 143 P.3d 1056, 1060 (Colo. App. 2005) ("Arguments not presented to or ruled on by the trial court cannot be raised for the first time on appeal.").  But, if we addressed it, we would conclude that one does not enter into an exculpatory agreement unfairly simply because payment under the agreement is nonrefundable.

¶ 23    In *Patterson,* the plaintiff argued that "the exculpatory agreement . . . was not fairly entered into due to the fact that [her] payment for the lift ticket was nonrefundable, and thus she was not 'free to walk away.'"  926 F.3d at 641 (footnote and citation omitted).  The Tenth Circuit Court of Appeals, however, rejected this argument, for the same reasons we would:

> [T]he term "free to walk away" [is used] to explain that an individual engaging in a recreational activity, unlike an individual who seeks to obtain housing or other necessities of life, is not constrained to participate and accordingly may opt out of an activity if he is unwilling to accept exculpatory terms.  Plaintiffs do not cite to a single Colorado case — or federal case applying Colorado law — that would support Plaintiffs' interpretation of "free to walk away" to mean free from all costs, rather than free from compulsion or coercion.

13

> To the contrary, our cases have upheld
> exculpatory agreements for recreational
> activities even where the facts would suggest
> that the individual might well have lost money
> if she had chosen not to engage in the activity
> upon receipt of the exculpatory agreement. . . .
> We have found no cases from either this court
> or from a Colorado court suggesting that the
> third *Jones* factor can only be satisfied if an
> individual would have been able to back out of
> an optional activity without incurring any
> costs; rather, all of the pertinent authorities
> indicate that this factor will generally be
> satisfied where the contract relates to a non-
> essential recreational activity, absent evidence
> of unusual circumstances such as
> incompetency.

*Id.* at 640-41 (citations omitted).

¶ 24    Finally, in our view, Redden's argument about Clear Creek's "sneaking" broadly worded exculpation language into a document purportedly predominantly addressing Redden's equipment impacts the fourth *Jones* factor (interpreting the agreements) rather than the third.  For purposes of the third factor, what is important is that in two separate locations on the signed waiver, Redden acknowledged that she had an opportunity to review the contents of

the agreement she was about to — and did — sign twice.[6] As to the ticket waiver, in her deposition Redden acknowledged that she (1) was familiar with the language on its back ("Oh, it's been in existence for a while. I probably have read it several times over the years."), and (2) purchased the ticket knowing that language was present on the back.

### 3. The Fourth Jones Factor

¶ 25 Turning to the fourth *Jones* factor, Redden contends that the agreements do not "clearly" and "unambiguously" express her intent to relieve Clear Creek of liability from negligence in operating its ski lifts. To this end, she asserts that a reasonable person could have interpreted (1) the signed waiver as limiting the liability of only the boot shop, the manufacturers, and distributors of the boots; and (2) the ticket waiver as limiting Clear Creek's liability for the

---

[6] A "party signing an agreement is presumed to know its contents," *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 n.5 (Colo. 1998) (citing *Cordillera Corp. v. Heard*, 41 Colo. App. 537, 592 P.2d 12 (1978)), and to have assented to its terms. *See Hartfield v. City of Billings*, 805 P.2d 1293, 1297 (Mont. 1990); *see also* 17B C.J.S. *Contracts* § 938, Westlaw (database updated Sept. 2020) ("A party who signs a document is presumed to know its contents or terms as a matter of law," to have "read and understood" it, and "to have assented to its contents.") (footnotes omitted).

listed inherent risks and dangers of skiing, and not for its operation of a ski lift. We are not persuaded.

¶ 26    To determine whether the parties' intent was clearly and unambiguously expressed, the agreements' "language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed." *Ad Two, Inc. v. City & Cnty. of Denver*, 9 P.3d 373, 376 (Colo. 2000). Contract terms "are ambiguous when they are susceptible to more than one reasonable interpretation." *Id.* "The inquiry should be whether the intent of the parties was to extinguish liability and whether this intent was clearly and unambiguously expressed." *Heil*, 784 P.2d at 785; *see also Stone*, ¶ 21.

¶ 27    To the extent the fourth factor considers the character of the activity, it only focuses on whether the agreement's language, evidencing the parties' intention, covers the activity in question. *Compare Stone*, ¶ 27 (the dominant focus of the exculpatory agreement was limited to the assumption of the risk of strenuous exercise and using exercise equipment at a fitness center), *with Jones*, 623 P.2d at 378 (the exculpatory agreement covered injuries sustained "while upon the aircraft of the Corporation").

16

¶ 28     With respect to the assertion that a reasonable person could have interpreted the signed waiver as limiting the liability of only the boot shop, the manufacturers, and distributors of the boots, Redden points to paragraph six of the signed waiver and argues, "[the signed waiver] advised that 'the equipment manufacturers and distributors' would be held harmless for claims 'arising from the PURCHASER'S use of this equipment . . . .'"  But Redden overlooks the long list of parties mentioned in the paragraph that she released from "any and all liability" by signing the agreement: "*Clear Creek Ski Corporation d/b/a/ Loveland Ski Areas*, the equipment manufacturers and distributors, *their successors in interest, their affiliated organizations and companies, and each of their respective insurance carriers, agents, employees, representatives, assignees, officers, directors, and shareholders*[.]"  (Emphasis added.)  And, she released these parties from "any and all liability" for claims (including claims based on "alleged or actual negligence") "arising from the PURCHASER's use of this equipment."  She did so after agreeing (in paragraph five) to voluntarily assume "all risks" associated with her participation in the "ACTIVITY," which included the use of ski lifts.

17

¶ 29    Redden's signed waiver unambiguously encompasses "ALL" risks — including Clear Creek's negligence — associated with her use of ski lifts.  *See Hudgeons v. Tenneco Oil Co.*, 796 P.2d 21, 23 (Colo. App. 1990) ("'All' is an unambiguous term and means the whole of, the whole number or sum of, or every member or individual component of, and is synonymous with 'every' and 'each.'").

¶ 30    Similar language appears — achieving a similar effect — in the ticket waiver.  In addition to the statutorily mandated warning of the inherent risks and dangers of skiing, the ticket waiver also includes (under the phraseology of an "understanding") a warning in capital letters that the use of ski lifts can be hazardous.  And, the ticket waiver provides that, "[i]n consideration of using the premises, Holder agrees to ASSUME ALL RISKS associated with the activities and to HOLD HARMLESS Loveland Ski Area and its representatives for all claims for injury to person or property."

¶ 31    We conclude that the two exculpatory agreements are clear: The purchaser of the boots and the holder of the ticket are "to assume all risks of skiing, whether inherent to skiing or not."  *See Patterson*, 926 F.3d at 643 (enforcing the agreement even though it

did not specifically detail that it would release claims arising out of the defendant's employee's allegedly negligent operation of the ski lift (citing *Brigance*, 883 F.3d at 1257)); *B & B Livery, Inc. v. Riehl*, 960 P.2d 134, 138 (Colo. 1998) (upholding waiver containing the statutorily mandated warning for inherent risks resulting from equine activities as well as a broader clause limiting liability from non-inherent risks).

¶ 32    In so concluding, we reject Redden's misplaced reliance on *Stone*. There, the plaintiff sued a fitness club when she tripped on a hair dryer cord after washing her hands. *Stone*, ¶ 1. The district court granted summary judgment for the fitness club based on an exculpatory agreement. *Id.* On appeal, a division of this court reversed, after concluding, for seven reasons, that the agreement did not clearly and unequivocally bar the plaintiff's lawsuit. *Id.* at ¶ 35. In the division's view, the agreement "use[d] excessive legal jargon, [wa]s unnecessarily complex, and create[d] a likelihood of confusion or failure of a party to recognize the full extent of the release provisions." *Id.* The division noted that

> nothing in the Agreement refer[red] to risks of
> using sinks or locker rooms. The assumption
> of risk clause refer[red] to the "risk of loss,

19

> theft or damage or personal property" for the member or her guests while "using any lockers" at a Life Time Fitness center. That is quite a separate matter, however, from suffering a physical injury in a locker room.

*Id.* at ¶ 33.

¶ 33    The exculpatory agreements here are readily distinguishable from the one in *Stone.* They are not inordinately long and do not contain "excessive" legal jargon. And, most importantly, they both explicitly encompass the waiver of injuries resulting from the use of ski lifts.

¶ 34    Consequently, we conclude that the signed waiver and the ticket waiver unambiguously evidence the parties' intention to cover the activity in question — that is, riding on a ski lift. *See Heil,* 784 P.2d at 785; *see also Stone,* ¶ 21. Thus, they are enforceable under *Jones.*

### III.    The Agreements Do Not Undermine the Public Policies Underlying the PTSA and the SSA

¶ 35    Redden also contends that, even if the waivers are enforceable under *Jones,* they are still invalid because they are contrary to public policy expressed in the PTSA and SSA. We disagree.

¶ 36    "Statutory provisions may not be modified by private agreement if doing so would violate the public policy expressed in the statute." *Phillips v. Monarch Recreation Corp.*, 668 P.2d 982, 987 (Colo. App. 1983). Whether a private agreement violates public policy is a question of law that we review de novo. *See Griffin v. State Farm Mut. Auto. Ins. Co.*, 2016 COA 127, ¶ 9 ("Whether an insurance policy provision violates public policy, and is therefore void and unenforceable, is . . . a question of law that we review de novo.").

### A.    *The PTSA and SSA: An Overview*

¶ 37    The General Assembly enacted the PTSA in 1965 to assist "in safeguarding life, health, property, and the welfare of the state in the operation of passenger tramways." § 12-150-101, C.R.S. 2020.[7] To this end, the General Assembly established "a board empowered

---

[7] Until October 1, 2019, the PTSA had been codified at sections 25-5-701 to -721, C.R.S. 2018. *See* Ch. 136, sec. 1, § 12-150-101 to -120, 2019 Colo. Sess. Laws 977-87.

The PTSA applies to ski lifts commonly used in ski areas. *See* § 12-150-103(5)(a), (d), C.R.S. 2020 (defining, as pertinent here, a "fixed-grip lift" as "an aerial lift on which carriers remain attached to a haul rope," and a "chair lift" as "a type of transportation on which passengers are carried on chairs suspended in the air and attached to a moving cable, chain, or link belt").

to," as pertinent here, "assure that . . . accepted safety devices and sufficient personnel are provided for, and that periodic inspections and adjustments are made that are deemed essential to the safe operation of, passenger tramways." *Id.*

¶ 38    "The legislature has empowered the [Tramway] Board with rulemaking and enforcement authority to carry out its functions," including the "authority to conduct investigations and inspections, to discipline ski area operators, to issue licenses, to order emergency shut downs, and to engage in other functions related to the purpose of the [PTSA]." *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 73 (Colo. 1998) (footnote omitted) (citing statutes now codified at sections 12-150-101 to -120).

¶ 39    In 1979, the Colorado General Assembly enacted the SSA to (1) supplement the PTSA; (2) "further define the legal responsibilities of ski area operators and their agents and employees"; (3) "define the responsibilities of skiers using such ski areas"; and (4) "define the rights and liabilities existing between the skier and the ski area operator and between skiers." § 33-44-102, C.R.S. 2020.

¶ 40    In 1990, the General Assembly amended the SSA to limit the liability of ski area operators by providing that "no skier may make any claim against or recover from any ski area operator for injury resulting from any of the inherent dangers and risks of skiing." *Brigance*, 883 F.3d at 1259 (quoting § 33-44-112, C.R.S. 2020); *see* Ch. 256, sec. 7, § 33-44-112, 1990 Colo. Sess. Laws 1543.

¶ 41    Section 33-44-104(2), C.R.S. 2020, of the SSA provides:

> A violation by a ski area operator of any requirement of this article 44 or any rule promulgated by the passenger tramway safety board pursuant to section 12-150-105(1)(a) shall, to the extent such violation causes injury to any person or damage to property, constitute negligence on the part of such operator.[8]

---

[8] Under the rules adopted by the Tramway Board, "[a]ll personnel shall use reasonable care while performing their duties," and a ski lift attendant has duties

> a) to be knowledgeable of operational and emergency procedures and the related equipment needed to perform the assigned duties;
>
> b) to monitor the passengers' use of the aerial lift; including observing, advising and assisting them while they are in the attendant's work area as they embark on or disembark from the aerial lift; and to respond to unusual

23

¶ 42    The overall effect of the PTSA and SSA is to "provide a comprehensive Colorado framework which preserves ski lift common law negligence actions, while at the same time limiting skier suits for inherent dangers on the slopes and defining per se negligence for violation of statutory and regulatory requirements." *Bayer*, 960 P.2d at 75.

## B.    Analysis

¶ 43    In *Brigance*, the Tenth Circuit Court of Appeals considered — and rejected — the very argument that Redden makes here; that is,

---

occurrences or conditions, as noted.  The attendant should respond by choosing an appropriate action, which may include any of the following.

1) assisting the passenger;

2) slowing the aerial lift (if applicable);

3) stopping the aerial lift;

4) continuing operation and observation.

Am. Nat'l Standard for Passenger Ropeways — Aerial Tramways, Aerial Lifts, Surface Lifts, Tows and Conveyors — Safety Requirements §§ 4.3.2.3, 4.3.2.3.3 (Am. Nat'l Standards Inst. 2011) (known as ANSI B77.1-2011); *see* Dep't of Regul. Agencies Rule 0.1, 3 Code Colo. Regs. 718-1 (adopting and incorporating by reference the safety requirements in ANSI B77.1-2011) (current version incorporates up to B77.1-2017).

that enforcing exculpatory agreements in the skiing context violates

the public policy underlying the PTSA and SSA:

> It is true that the SSA and PTSA identify various duties and responsibilities that, if violated, may subject a ski area operator to liability. But the acts establish a framework preserving common law negligence actions in the ski and ski lift context, *Bayer*, 960 P.2d at 75, and do nothing to expressly or implicitly preclude private parties from contractually releasing potential common law negligence claims through use of an exculpatory agreement. While "a statute . . . need not explicitly bar waiver by contract for the contract provision to be invalid because it is contrary to public policy," *Stanley v. Creighton Co.*, 911 P.2d 705, 707 (Colo. App. 1996), Dr. Brigance does not identify a single provision in either the SSA or PTSA suggesting the enforcement of exculpatory agreements in the ski and ski lift context is impermissible or contrary to public policy. Moreover, "Colorado law has long permitted parties to contract away negligence claims in the recreational context" and we "generally will not assume that the General Assembly mean[t] to displace background common law principles absent some clear legislative expression of that intent." *Espinoza* [*v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1154, 1155 (10th Cir. 2016)]. This principle is particularly relevant in the context of exculpatory agreements because "[t]he General Assembly . . . has shown that — when it wishes — it well knows how to displace background common law norms and preclude the release of civil claims." *Espinoza*, 809 F.3d at 1154–55.

25

*Brigance*, 883 F.3d at 1260-61.[9]

¶ 44    "[W]e are not bound by decisions of federal courts applying

Colorado law." *Walker v. Ford Motor Co.*, 2015 COA 124, ¶ 25, *aff'd*

*on other grounds*, 2017 CO 102.  Nonetheless, we are persuaded by

---

[9] The Tenth Circuit noted that its conclusion was also supported by
the General Assembly's enactment of section 13-22-107, C.R.S.
2020, which authorizes a parent to release or waive a child's
prospective claim for negligence.  *Brigance v. Vail Summit Resorts,
Inc.*, 883 F.3d 1243, 1260 (10th Cir. 2018).  The statute overruled
the supreme court's holding in *Cooper v. Aspen Skiing Co.*, 48 P.3d
1229 (Colo. 2002), that public policy prohibited a parent or
guardian from releasing prospective claims for negligence brought
on behalf of a minor who had injured himself while skiing.  The
Tenth Circuit noted that

> the General Assembly explained [in section 13-
> 22-107] that . . . it is the public policy of
> Colorado that "[c]hildren . . . should have the
> maximum opportunity to participate in
> sporting, recreational, educational, and other
> activities where certain risks may exist" and
> that "[p]ublic, private, and non-profit entities
> providing these essential activities to children
> in Colorado need a measure of protection
> against lawsuits."

*Brigance*, 883 F.3d at 1261 (quoting § 13-22-107(1)(a)(I), (II), C.R.S.
2020).  "The General Assembly's enactment of § 13-22-107," the
Tenth Circuit said, "*suggests* it did not intend and would not
interpret the SSA as barring [exculpatory] agreements for adults."
*Id.* (emphasis added).

the reasoning in *Brigance* and, consequently, reach the same conclusion.

¶ 45    Redden disputes this conclusion, based on section 33-44-103(3.5), C.R.S. 2020, which provides:

> The term "inherent dangers and risks of skiing" does not include the negligence of a ski area operator as set forth in section 33-44-104(2).  Nothing in this section shall be construed to limit the liability of the ski area operator for injury caused by the use or operation of ski lifts.

¶ 46    In our view, this provision does not help Redden.  By its terms, it says "[n]othing in this section shall be construed to limit" negligence claims against the operators of ski lifts; it says nothing, however, about whether, wholly apart from the statute, the parties could or could not privately agree to waive such claims.

¶ 47    The State of Alaska has a statutory provision similar to section 33-44-103(3.5).  *See* Alaska Stat. § 05.45.020(a) (2020) ("A ski area operator or other person who violates a requirement of this chapter, a provision of a plan of operation prepared under AS 05.45.040, or a regulation adopted by the Department of Labor and Workforce Development under AS 05.20.070 is negligent and civilly liable to the extent the violation causes injury to a person or damage to

property."). But it also has a separate provision expressly invalidating private agreements waiving liability of ski area operators. *See* Alaska Stat. § 05.45.120(a), (b) (2020) (Except for special events and rental programs, "[a] ski area operator may not require a skier to sign an agreement releasing the ski area operator from liability in exchange for the right to ride a ski area tramway and ski in the ski area. A release that violates this subsection is void and may not be enforced."); *see also Rogowicki v. Troser Mgmt. Inc.*, 623 N.Y.S.2d 47, 48 (App. Div. 1995) (statute rendering unenforceable any agreement to exempt from liability the owner or operator of a place of recreation who receives fees for use of its facilities applied to disclaimer language printed on back of injured skier's lift ticket and ski school lesson coupon book).

¶ 48    In other contexts, our General Assembly has not been reluctant to invalidate exculpatory agreements. *See, e.g.*, § 8-13.3-416, C.R.S. 2020 ("Any agreement by an employee to waive the employee's rights [to medical leave] . . . is void as against public policy."); § 11-51-604(11), C.R.S. 2020 ("Any condition, stipulation, or provision binding any person acquiring or disposing of any security to waive compliance with any provision of this article or

any rule or order under this article is void."); § 13-20-806(7)(a), C.R.S. 2020 ("In order to preserve Colorado residential property owners' legal rights and remedies, in any civil action or arbitration proceeding described in section 13-20-802.5(1), any express waiver of, or limitation on, the legal rights, remedies, or damages provided by the 'Construction Defect Action Reform Act', this part 8, or provided by the 'Colorado Consumer Protection Act', article 1 of title 6, C.R.S., as described in this section, or on the ability to enforce such legal rights, remedies, or damages within the time provided by applicable statutes of limitation or repose are void as against public policy."); § 38-38-703, C.R.S. 2020 ("A waiver of or agreement to shorten the time period to exercise the right to cure a default granted by the provisions of this article that is made before the date of the default as to which the waiver is granted under a deed of trust, mortgage, or other instrument evidencing a lien or an evidence of debt secured thereby shall be void as against public policy.").

¶ 49    Consequently, we take into account that, had the General Assembly intended to outlaw exculpatory agreements in connection with the use of ski lifts, "it knew how to do so." *Students for*

29

*Concealed Carry on Campus, LLC v. Regents of the Univ. of Colo.*, 280 P.3d 18, 23 (Colo. App. 2010), *aff'd*, 2012 CO 17. Yet it did not do so. And it has not done so, despite the number of federal court decisions enforcing these types of exculpatory agreements since 1992. *See supra* Part II.A.1.

¶ 50 We, like the Tenth Circuit, view the General Assembly's failure to address the effect of the type of exculpatory agreement here as significant. Viewing the legislature's silence in light of Colorado's history of enforcing exculpatory agreements in connection with recreational activities, we discern no basis in the PTSA or SSA for voiding, on public policy grounds, the signed and ticket waivers in this case. *See Chauvlier v. Booth Creek Ski Holdings, Inc.*, 35 P.3d 383, 387 (Wash. Ct. App. 2001) (enforcing exculpatory agreement, despite statutes "delineat[ing] [the] responsibilities of both skiers and ski resort operators," and the ski area operator having "significant control over the safety of its customers while they are using the area's lifts and trails"); *cf. Bayer*, 960 P.2d at 76 ("The

legislature has carefully chosen how to let stand, supplement, or limit application of the common law in the arena of ski safety[.]").[10]

---

[10] The dissenting opinion disagrees with this conclusion but only insofar as it concerns Redden's negligence per se claim. *Infra* ¶ 55. We have no quarrel with the dissent's underlying premise — that is, that an exculpatory clause will generally not provide a defense to an action for negligence per se because public policy will not permit contracting parties to avoid liability for their breach of specific statutory requirements. But in this case, Redden's negligence per se claim is based on the rules adopted by the Tramway Board, which, as was noted above, *supra* ¶ 41 n.8, require a ski lift attendant to "use reasonable care" in "choosing an appropriate action" to address issues related to passengers' use of the ski lift. Redden

> does not suggest how these provisions create any distinctly new duty of care. Indeed, they appear to be more or less coextensive with the preexisting common law standard of care, which requires parties to act with "reasonable care . . . i.e., that which a person of common prudence would use under the circumstances." *Christensen v. Hoover*, 643 P.2d 525, 529 (Colo. 1982). And given this it seems hard to see a rational basis on which the law might treat such similar (identical?) claims so differently based merely on how they are pleaded, rewarding the crafty but penalizing the pedestrian pleader.

*Espinoza v. Ark. Valley Adventures, LLC*, 809 F.3d 1150, 1153-55 (10th Cir. 2016) (finding that, under Colorado's "relatively permissive public policy toward recreational releases," release was enforceable against negligence claim based on violation of statute

¶ 51    In so concluding, we reject Redden's assertion that the use of

exculpatory agreements like those in the present case (1) leaves

skiers' safety wholly at the mercy of ski industry employees and (2)

removes any incentive for ski areas to effectively manage risks of

skier safety.  Under our law, exculpatory agreements *cannot* operate

to release another person or entity from liability caused by grossly

(i.e., willful and wanton) negligent or reckless conduct.  *See*

*McShane v. Stirling Ranch Prop. Owners Ass'n*, 2017 CO 38, ¶ 20

("Under no circumstances will an exculpatory agreement be

permitted to shield against a claim of willful and wanton

---

that essentially codified the preexisting common law standard of
care).

The dissent dismisses this analysis, asserting that in *Bayer* the
supreme court recognized that different standards of care apply,
depending on whether a negligence claim is pursued under the
common law or under the PTSA and SSA.  In our view, the dissent
misreads the import of *Bayer*, which is that, regardless of the basis
of the negligence claim, the standard of care remains the same.  *See*
*Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 72 (Colo.
1998) ("We hold that the Tramway Act and the Ski Safety Act, alone
or in combination, have not preempted or superseded the common
law standard requiring a ski lift operator to exercise the highest
degree of care commensurate with the practical operation of the ski
lift.  The General Assembly did not intend by either act to substitute
a standard of care lesser than the highest degree."); *see also id.* at
76 (the legislature "has chosen not to alter the standard of care
applicable to ski lift safety").

negligence."); *Core-Mark Midcontinent, Inc. v. Sonitrol Corp.*, 2012 COA 120, ¶ 18 ("[M]ost courts will not enforce exculpatory or limiting provisions that 'purport to relieve parties from their own willful, wanton, reckless, or intentional conduct.'" (quoting *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008))); *see also* § 13-22-107(4), C.R.S. 2020 (a parent signing a waiver releasing negligence claims on behalf of their child may not "waive the child's prospective claim against a person or entity for a willful and wanton act or omission, a reckless act or omission, or a grossly negligent act or omission").  And incentives for ski resorts to safely operate ski lifts exist by virtue of PTSA provisions authorizing the Tramway Board to

- "receive complaints";

- "investigate matters";

- "cause the prosecution and enjoinder . . . of all persons violating the [Act's] provisions";

- "conduct meetings, hold hearings, and take evidence";

- "discipline area operators"; and

- "impose disciplinary action," including sending letters of admonition, assessing fines (up to $50,000 if acts or

omissions are found to be willful), and "impos[ing] . . . reasonable conditions upon the continued licensing of a passenger tramway."

§ 12-150-105(1)(a)-(e), (j), C.R.S. 2020; § 12-150-107(2), C.R.S. 2020.

¶ 52     Finally, we also reject Redden's reliance on the *holding* in *Phillips*, 668 P.2d 982.  In *Phillips*, the division concluded that because the SSA "allocate[s] the parties' respective duties with regard to the safety of those around them, . . . the trial court correctly excluded a purported [exculpatory] agreement intended to alter those duties."  *Id.* at 987.  But as the court in *Brigance* noted, "apparently unlike the agreement at issue in *Phillips*, the [two agreements here] do not appear to alter the duties placed upon [the ski resort] under the SSA," and the division's decision in *Phillips* "appears to be inconsistent with the more recent pronouncements by the Colorado Supreme Court and General Assembly regarding Colorado policies toward the enforceability of exculpatory agreements in the context of recreational activities.  Moreover, as detailed above, the SSA and PTSA do not express a policy against exculpatory agreements."  *Brigance*, 883 F.3d at 1261-62.

34

## *IV. Disposition*

¶ 53    The judgment is affirmed.

JUDGE HAWTHORNE concurs.

JUDGE DAVIDSON concurs in part and dissents in part.

JUDGE DAVIDSON, concurring in part and dissenting in part.

¶ 54    Plaintiff's amended complaint included two claims for relief —

one for common law negligence; the other for negligence per se for

violation of explicit duties set forth under section 33-44-104(2),

C.R.S. 2020, of the SSA.  In a single paragraph — and for the same

reason — the trial court dismissed both claims as barred by

exculpatory agreements.

¶ 55    As to the trial court's dismissal of the common law negligence

claim, I agree with plaintiff that approval of the use of exculpatory

agreements to effectively immunize ski area operators from financial

responsibility for their injury-causing negligence seems to

undermine the very purpose of the defined rights and liabilities set

forth in the SSA.  Nevertheless, I can't ignore that Colorado state

and federal decisions validating the use of such exculpatory

agreements to bar common law negligence claims in recreational

cases — now including ski lift injury actions — have been met with

silence from the Colorado legislature.[1]

---

[1] In contrast, as mentioned in the majority opinion, after the supreme court's decision in *Cooper v. Aspen Skiing Co.*, 48 P.3d 1229 (Colo. 2002), the legislature responded swiftly by adding

36

¶ 56    Thus, to the extent the majority interprets legislative inaction as approval of the use of exculpatory agreements to bar plaintiff's common law negligence claim here, I reluctantly agree. However, because ski lift operators cannot be immunized by private contract from their explicit statutory duties as set forth in the SSA and PTSA, I disagree with the majority that the exculpatory agreements also barred plaintiff's statutory negligence per se claim.

¶ 57    To protect passenger safety, the SSA mandates that ski lift operators follow the provisions of the SSA, the PTSA, and the specific regulations adopted by the passenger tramway safety board (PTSB) § 33-44-104(2). The SSA instructs that ski lift operators must reasonably comply with each of these duties, defines a violation of its provisions as negligence per se, and provides a civil remedy for an injury-causing breach. The effect of these statutory provisions — according to our supreme court — is to make

---

section 13-22-107, C.R.S. 2020. However, of note here, the stated policy behind that legislation was "to encourage the affordability and availability of youth activities . . . by permitting a parent of a child to release a prospective negligence claim of the child against certain persons and entities involved in providing the opportunity to participate in the activities." § 13-22-107(1)(a)(VI). That policy is not in jeopardy in this case.

violations of the SSA and/or the PTSA negligence per se.  *Bayer v. Crested Butte Mountain Resort, Inc.*, 960 P.2d 70, 74-84 (Colo. 1998) (The SSA, PTSA and regulations "provide a comprehensive Colorado framework which *preserves ski lift common law negligence actions*, while at the same time limiting skier suits for inherent dangers on the slopes, *and defining per se negligence for violation of statutory and regulatory requirements*." (emphasis added).[2]

¶ 58    Here, in addition to a common law negligence claim, plaintiff's amended complaint contained a detailed statutory claim, seeking damages for injuries caused by defendant's violations of explicit provisions of the PTSA and SSA.  In my opinion, it should not have been dismissed as barred.

¶ 59    Relying on *Brigance v. Vail Summit Resorts, Inc.*, 883 F.3d 1243 (10th Cir. 2018), defendant insists that the exculpatory

---

[2] The SSA expressly supplements the PTSA, adopts the rules promulgated by the PTSA board, and provides for civil liability in negligence when violation of those rules results in injury.  *See* § 33-44-102, C.R.S. 2020 ("[T]he purpose of this article 44 is to supplement the passenger tramway safety provisions of article 150 of title 12 . . . ."); § 33-44-104(1), C.R.S. 2020 ("A violation of any requirement of this article shall, to the extent such violation causes injury to any person or damage to property, constitute negligence on the part of the person violating such requirement.").

agreements here were nevertheless enforceable to immunize it from

plaintiff's statutory per se claim, suggesting that, like the claim in

*Brigance*, plaintiff's claims were not sufficiently specific to effectively

alter any statutory duties. But the record shows that, unlike in

*Brigance*,[3] plaintiff's amended complaint spelled out in detail which

statutory and regulatory requirements were impacted, and how

defendant allegedly violated each of them.[4]

---

[3] In fact, the *Brigance* plaintiff's per se claim was not barred by exculpatory agreement, but dismissed for failure to state a claim because the complaint was facially insufficient to allege a statutory violation. *Brigance v. Vail Summit Resorts, Inc.*, No. 15-CV-1394-WJM-NYW, 2017 WL 131797, at *9 (D. Colo. Jan. 13, 2017) (dismissing as insufficient the plaintiff's negligence per se claim based on violation of subsections of section 25-5-706, C.R.S. 2020, which provided only generally for disciplinary action against operators of passenger tramways), *aff'd*, 883 F.3d 1243 (10th Cir. 2018).

[4] Specifically, with supporting factual allegations that at this point we would assume to be true, the amended complaint alleged that defendant violated three regulatory requirements, viz., that defendant failed to be knowledgeable of operational and emergency procedures; that defendant failed to monitor passengers' use of the aerial lifts by observing, advising, and assisting passengers as they disembarked from the lifts; and that defendant failed to respond appropriately to an unusual occurrence (here, that plaintiff was blocked from safely exiting the lift) by failing to stop the aerial lift — each in violation of a specific subsection of section 4.3.2.3.3 in the American National Standard for Passenger Ropeways — Aerial Tramways, Aerial Lifts, Surface Lifts, Tows and Conveyors — Safety

¶ 60    And, while it is generally true, as defendant asserts, that not every violation of a statutory duty supports a private civil remedy, the SSA explicitly provides for just that — a negligence per se claim for damages for victims of injury-causing violations of the PTSB regulations. Certainly, immunizing a ski lift operator by exculpatory agreement from the remedy explicitly provided for by the legislature, in the name of public safety, for injuries caused by a ski lift operator's violation of statutory duties, necessarily alters those duties; that is, the ski lift operator suffers no financial

---

Requirements (Am. Nat'l Standards Inst. 2011) (known as ANSI B77.1-2011), as adopted by the PTSB, which requires, inter alia, that a lift attendant must:
  1. be knowledgeable of operational and emergency procedures;
  2. monitor passengers' use of the aerial lifts by observing, advising, and assisting passengers as they disembark from the lift; and
  3. respond to unusual occurrences or conditions by choosing an appropriate action, which may include, without limitation,
  4. slowing and/or stopping the aerial lift.

To the extent that defendant also suggests that these statutory duties are not sufficiently specific to create a per se claim, I respectfully disagree. *See, e.g., Hendrickson v. Doyle*, 150 F. Supp. 3d 1233, 1239 (D. Colo. 2015) (To create a claim for negligence per se, "the relevant statute needs to prescribe or proscribe some relatively discrete action.").

consequence for negligent violation of those duties with which it is otherwise required, by law, to comply.

¶ 61 Moreover, because, by its plain language, the legislature clearly intended to create a negligence per se claim for violation of the specific statutory duties in the SSA, I am unpersuaded by the majority's reliance on *Espinoza v. Arkansas Valley Adventures*, 809 F.3d 1150, 1154 (10th Cir. 2016), to suggest that plaintiff's statutory negligence per se claim was properly barred as nothing more than a common law negligence claim with a different label. The statutory interpretation at issue in *Espinoza* was whether the legislature intended to create a negligence per se claim in § 33-32-107(2)(b), C.R.S. 2020, which proscribes operation of a commercial raft in a "careless or imprudent manner" and subjects a violator to criminal prosecution. The Tenth Circuit concluded that, because § 33-32-107(2)(b) did not provide for a civil remedy for a violation, and because a claim of operating a raft in a "careless and impudent manner" hardly differed from a common law negligence claim, that section did not allow the court to *imply* a legislative intent to create a claim for negligence per se. Here, however, the legislature's *explicit* provision of a civil remedy of negligence per se for violation

of specific duties set forth in the SSA, PTSA, and regulations —
such as alleged in plaintiff's amended complaint — is in stark
contrast to the river outfitter statute, which neither specified a civil
remedy nor prescribed or proscribed any discrete actions.
Importantly, because the legislative intent of the SSA is clear; we
have no need, unlike the *Espinoza* court, to search for it.[5]

¶ 62    Similarly, because the legislature *explicitly* created a statutory
per se claim in the SSA, separate and apart from a common law
claim, I see as merely distracting any suggestion that, as in the
river outfitter statute, there is no real distinction between the
standards of conduct for a common law claim and a statutory per
se claim brought under the SSA.  *See Bayer*, 960 P.2d at 78
(statutory negligence per se claims brought under SSA supplement
but don't replace pre-existing common law negligence claims).

---

[5] It may be that the explicit provision in the SSA of a separate
remedy of negligence per se for violations of statutory duties, to
date, is unique among Colorado recreational statutes.  *E.g.*, § 33-
32-107, C.R.S. 2020 (river outfitters); § 33-14-116, C.R.S. 2020
(snowmobiling); § 13-21-119(4)(b)(I), C.R.S. 2020 (equine activities);
§ 13-21-121, C.R.S. 2020 (agricultural recreation or agritourism
activities).

¶ 63    But, in any event, as I understand the supreme court's

analysis in *Bayer,* the standards are not the same. *See Bayer,* 960

P.2d at 78-80 (explaining that, as defined by the legislature, the

standard of conduct applicable to ski lift operators in a statutory

claim of negligence per se is ordinary and reasonable care

consistent with the rules and regulations of the SSA and PTSA and

deciding that, regardless of the SSA and PTSA, for common law

claims of negligence beyond the statutory duties with which a ski

operator is required by law to comply, the standard remains as the

highest standard of care). Indeed, according to *Bayer,* the standard

of care for a statutory claim (viz., reasonable care) is intended as

the *minimum* standard. Consequently, a statutory claim does not

preempt a separate common law claim against a ski lift operator for

failure to take additional safety precautions, to which, the supreme

court held, the highest standard of care applies.[6]

---

[6] "Where a statute, ordinance or regulation is found to define a
standard of conduct . . . the standard defined is normally a
minimum standard, applicable to the ordinary situations
contemplated by the legislation. This legislative or administrative
minimum does not prevent a finding that a reasonable man would
have taken additional precautions where the situation is such to

¶ 64    All things considered, from the plain language of the SSA, I understand the policy of the legislature concerning the use of ski lifts to be (1) to permit common law negligence claims against ski lift operators for failure to take additional safety precautions which exceed regulatory requirements; (2) to allow those claims to be waived by exculpatory agreement, but at the same time; to (3) require ski lift operators to meet minimum safety requirements; and, to help ensure that result, (4) provide a statutory remedy of negligence per se for any violation of the statute or regulations providing these minimum standards from which a ski lift operator cannot be immunized, by exculpatory agreement or otherwise.

¶ 65    Consistent with that, I add, potential sanction of ski lift operators by governmental authority per the PTSA is not enough to satisfy the public policy set forth in the SSA.  Nor is it material that ski lift accident victims may, aside from the SSA, seek damages against a ski lift operator for willful and wanton conduct.  To the point, as per the amicus brief, "the General Assembly enacted the

---

call for them."  *Bayer*, 960 P.2d 70, 79 (citing to the Restatement (Second) of Torts § 288C (1965), cmt. a.).

SSA as a means to regulate and police ski areas. It is axiomatic that the General Assembly intended these laws to have effect." *See Phillips v. Monarch Recreation Corp.*, 668 P.2d 982, 987 (Colo. App. 1983) ("The statutes at issue here [the SSA] allocate the parties' respective duties with regard to the safety of those around them, and the trial court correctly excluded a purported agreement intended to alter those duties."); *cf. Anderson v. Vail Corp.*, 251 P.3d 1125, 1129-30 (Colo. App. 2010) (The court noted that "[t]he ski resort also admits that '[its] release does not supplant [its] statutory duties,' and that its 'liability waiver does not dilute or limit the statutory duties with which it must comply. Rather, [its] waiver precludes any claim for negligence or liability beyond those statutory duties with which [it] is required by law to comply.'").

¶ 66    For these reasons, I would hold that the exculpatory agreements here did not bar plaintiff's negligence per se claim for violations of explicit duties laid out in the SSA, PTSA, and the regulations adopted by the PTSB. Accordingly, I would remand this case for further proceedings on that claim.