The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
July 28, 2022

**2022COA87**

**No. 20CA2051, *Scholle v. Ehrichs* – Health and Welfare — Health Care Availability Act — Limitation of Liability — Collateral Source Evidence — Contract Exception**

Among other things, a division of the court of appeals considers whether the trial court abused its discretion in entering a judgment (for $9 million) in excess of the Health-Care Availability Act's $1 million damages cap. In entering judgment in excess of the damages cap, the trial court did not consider that the injured party would not have to repay any third-party providers or payers for approximately $6 million in past medical expenses. A majority of the division concludes that that this was reversible error. The dissent opines that the majority's analysis is contrary to the plain language of the contract exception to the collateral source rule.

COLORADO COURT OF APPEALS        **2022COA87**

Court of Appeals No. 20CA2051
City and County of Denver District Court No. 17CV31764
Honorable Robert L. McGahey, Jr., Judge

Susan Ann Scholle, as Personal Representative for the Estate of Daniel B. Scholle,

Plaintiff-Appellee,

v.

Edward Ehrichs, M.D.; Michael Rauzzino, M.D.; and HCA-HealthONE, LLC, d/b/a Sky Ridge Medical Center,

Defendants-Appellants.

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division I
Opinion by JUDGE DAILEY
Tow, J., concurs
Berger, J., concurs in part and dissents in part

Announced July 28, 2022

Thomas Keel & Laird, LLC, Isobel S. Thomas, Jennifer L. Keel, Matthew R. Laird, Denver, Colorado; Connelly Law, LLC, Sean Connelly, Denver, Colorado, for Plaintiff-Appellee

Hershey Decker Drake, P.L.L.C., C. Todd Drake, Lone Tree, Colorado; Hall & Evans, L.L.C., Deanne C. McClung, Mary P. Kaluk, Denver, Colorado, for Defendant-Appellant Edward Ehrichs, M.D.

Wheeler Trigg O'Donnell LLP, Kevin J. Kuhn, Theresa Wardon Benz, Meghan Frei Berglind, Kevin C. Havelda, Denver, Colorado; Messner Reeves LLP, Douglas C. Wolanske, Mark B. Collier, Denver, Colorado, for Defendant-Appellant Michael Rauzzino, M.D.

Sharuzi Law Group, Ltd., Jacqueline B. Sharuzi, Theodore Hosna, Denver, Colorado, for Defendant-Appellant HCA-HealthONE, LLC, d/b/a Sky Ridge Medical Center

¶ 1	In this medical malpractice case, the defendants — Edward Ehrichs, M.D.; Michael Rauzzino, M.D.; and HCA-HealthONE, LLC, d/b/a Sky Ridge Medical Center (the Hospital) — appeal the trial court's entry of judgment in favor of Susan Ann Scholle, personal representative of the estate of the plaintiff, Daniel B. Scholle.[1]  We affirm in part, reverse in part, and remand with directions.

## I.	Background

¶ 2	During a five-week trial, the jury heard evidence from which it could reasonably find the following.

¶ 3	In August 2015, Daniel B. Scholle was severely injured as a result of elective back surgery performed by Doctors Ehrichs and Rauzzino at the Hospital.

¶ 4	Dr. Ehrichs is a general and vascular surgeon whose role in the surgery was to access the spine through the abdomen and, in his words, move "blood vessels out of the way so that the spine and disk space [are] exposed for the spine surgeon."  After doing so here,

---

[1] Daniel Scholle died on February 5, 2022.  This court granted Susan Scholle's motion for substitution of party on March 6, 2022.

Unless the context indicates otherwise, we're referring to Daniel B. Scholle or his legal team when we use the word "Scholle."

1

he left the operating room, and Dr. Rauzzino — a specialist in spinal surgery — and his Physician's Assistant (PA) then performed the spinal procedure: a discectomy and anterior lumbar interbody fusion (ALIF).

¶ 5　　Around 1:25 p.m., while removing a guide device — the Medtronic LT cage system — during the fusion part of the procedure, Dr. Rauzzino detected heavy bleeding from what was eventually determined to be an injury to Scholle's iliac vein. Dr. Ehrichs was recalled to the operating room, and he and Dr. Rauzzino tried unsuccessfully to get control of the bleeding. Hospital medical personnel (the medical team), including other surgeons and an on-call physician, were called in to help.

¶ 6　　Scholle experienced significant blood loss[2] and received a constant blood transfusion. Around 4:05 p.m., he went into cardiac arrest. He was revived.

¶ 7　　Around 4:15 p.m., the medical team doctors decided to repair the injury to Scholle's vein using venous stents. But the stents

---

[2] Scholle lost seventeen liters of blood — about three times his total blood volume — throughout the procedure.

were too small for Scholle's atypically large vein. Consequently, the Hospital's medical team opted to obtain, from another hospital, an endovascular aneurysm repair (EVAR) kit containing a larger stent that was designed for use in performing abdominal aortic aneurysm (AAA) surgeries. Using two EVAR stents, the medical team was able to repair Scholle's vein and hand the matter back to Dr. Ehrichs at 6:43 p.m. to finish the procedure. Scholle was then transported to the intensive care unit (ICU).

¶ 8 Dr. Ehrichs saw Scholle the next day, hoping to confirm that he could soon remove some laparotomy pads (i.e., sponges) he had used during the surgery to absorb some of the bleeding. Dr. Ehrichs determined, however, that Scholle was too unstable at that point and chose, instead, to remove the pads "two or three" days later.

¶ 9 Scholle stayed in the ICU for 100 days because of continued complications. He suffered an infection in the surgical site, which progressed into sepsis and required repeated abdominal surgeries; injured kidneys requiring repeated dialysis; an abdominal abscess; peritonitis; colon perforation; respiratory distress; stroke; foot drop; and gangrene in the toes requiring an amputation.

¶ 10    Scholle also spent a month in a rehabilitation center and continued receiving medical treatment for different problems experienced since surgery.

¶ 11    Two years after the surgery, Scholle filed the present medical malpractice action against Drs. Ehrichs and Rauzzino and the Hospital. And after a twenty-two-day trial, the jury determined that Dr. Rauzzino was 45% responsible, Dr. Ehrichs 40% responsible, and the Hospital 15% responsible, for $9,292,887 in economic damages to Scholle.[3]

¶ 12    The trial court said that it would subsequently (1) adjust the jury's award of damages in accordance with the Health-Care Availability Act (HCAA), sections 13-64-101 to -503, C.R.S. 2021; and (2) enter judgment *nunc pro tunc* to the day of the jury's verdict, for purposes of calculating interest.

¶ 13    Approximately three months after the jury returned a verdict, the trial court, in a written order, found that "good cause" existed for allowing damages in excess of the $1 million HCAA cap.

---

[3] The award encompassed $6 million for past medical expenses; $292,600 for past lost earnings; $2,616,876 for future medical expenses; and $383,411 for future lost income.

4

¶ 14     And, nearly ten months after the jury returned a verdict, and after significant post-trial litigation, the trial court determined in a written order that (1) judgment would enter as of that date (as opposed to date the jury returned its verdict); (2) prejudgment interest was part of the damages award; (3) Scholle was entitled, as of that date, to $5,040,278.31 in prejudgment (prefiling, post-filing, and post-verdict) interest; and (4) final judgment would, then, enter in the amount of $14,997,980.28, with each of the three defendants liable according to the jury's previous allocation of fault.

¶ 15     All three defendants now appeal.

## II.     Issues on Appeal

¶ 16     The defendants raise numerous issues on appeal.  The issues can, however, be categorized as follows:

> 1. Did the trial court err by denying Dr. Rauzzino's and the Hospital's motions for directed verdict?
>
> 2. Did the court err by instructing the jury on physical impairment, the "thin skull" doctrine, and negligence per se?
>
> 3. Does the record support the jury's award of economic damages?

4. Did the court properly enter judgment in excess of the $1 million HCAA damages cap and without accounting for possible collateral sources of compensation?

5. Did the court properly enter judgment without giving it *nunc pro tunc* effect to the day the jury returned its verdict?

¶ 17 We address each contention in turn.

> III. *Dr. Rauzzino's and the Hospital's Motions for Directed Verdict*

¶ 18 Dr. Rauzzino and the Hospital contend that the trial court erred by determining that there was sufficient evidence of their negligence to send the issue of their liability to the jury.[4] We disagree.

---

[4] Unlike Dr. Rauzzino and the Hospital, Dr. Ehrichs does not make such a challenge on appeal. Scholle had alleged that Dr. Ehrichs was negligent in failing to remain in the operating room during surgery; failing to properly and timely identify and care for Scholle's condition; repeatedly using the same or similar, but ineffective, techniques to repair the vein injury, thereby worsening it; failing to timely request assistance; failing to properly assess, monitor, and care for Scholle; and leaving the sponges in Scholle's body for an extended period of time.

¶ 19     We review a trial court's decision on a motion for directed verdict de novo.  *State Farm Mut. Auto. Ins. Co. v. Goddard*, 2021 COA 15, ¶ 26.

### *A.     General Legal Principles*

¶ 20     Under C.R.C.P. 50, a party may move for a directed verdict at the close of the evidence offered by the opposing party.  "Directed verdicts are not," however, "favored."  *Goddard*, ¶ 25.  Indeed, a motion for directed verdict may be granted only if the evidence, considered in the light most favorable to the nonmoving party, "compels the conclusion that reasonable persons could not disagree and that no evidence, or legitimate inference therefrom, has been presented upon which a jury's verdict against the moving party should be sustained.'"  *Id.* (quoting *Burgess v. Mid-Century Ins. Co.*, 841 P.2d 325, 328 (Colo. App. 1992)).

¶ 21     "Like the [trial] court, we must consider all the facts in the light most favorable to the nonmoving party and determine whether a reasonable jury could have found in favor of the nonmoving party."  *Id.* at ¶ 26.  A court shouldn't grant a motion for directed verdict "unless there is no evidence that could support a verdict

against the moving party on the claim." *Parks v. Edward Dale Parrish LLC*, 2019 COA 19, ¶ 10.

¶ 22    "Like other negligence actions," to succeed on a medical malpractice action, a "plaintiff must show a legal duty of care on the defendant's part, breach of that duty, injury to the plaintiff, and that the defendant's breach caused the plaintiff's injury." *Day v. Johnson*, 255 P.3d 1064, 1068-69 (Colo. 2011).

## B.    Dr. Rauzzino

¶ 23    As the supreme court noted in *Day*,

> [A] medical malpractice claim requires more than proving a poor outcome; a breach of the applicable standard of care is required. To establish a breach of the duty of care in a medical malpractice action, the plaintiff must show that the defendant failed to conform to the standard of care ordinarily possessed and exercised by members of the same school of medicine practiced by the defendant. That standard of care is measured by whether a reasonably careful physician of the same school of medicine as the defendant would have acted in the same manner as did the defendant in treating and caring for the patient. Thus, the standard of care for medical malpractice is an objective one.

*Id.* at 1069 (footnote and citations omitted).

¶ 24　　Dr. Rauzzino contends that the trial court erred by denying his motion for directed verdict because there was insufficient evidence to show that he breached a duty of care owed to Scholle by operating despite risks associated with Scholle's diabetes, using a PA to assist during surgery, and using the Medtronic device.

### 1. Operating Despite Risks Associated with Scholle's Diabetes

¶ 25　　Evidence was presented at trial that Scholle's primary care physician (PCP) ordered routine pre-operation blood tests five days before surgery, including an A1C test, which measured an average of blood glucose levels over an approximate three-month time period, and a different test for current blood glucose levels. Scholle's results showed that, although his current blood glucose level was within the normal range, he had elevated A1C levels, indicating poor blood sugar control over the three-month period before surgery.

¶ 26　　Scholle presented Dr. Jeffrey Poffenbarger as a standard of care expert witness. He was a practicing neurosurgeon for nineteen years and had performed the same surgery as Scholle's numerous times.

¶ 27   According to Dr. Poffenbarger, Scholle's A1C levels were "extremely" elevated — an indication of uncontrolled diabetes that could lead to "poor wound healing, poor bone growth rates after surgery," and "increased risk of infection."[5]  A1C levels could be improved with diligent efforts, Dr. Poffenbarger testified, but it takes some time to do so.

¶ 28   Dr. Poffenbarger testified that "in an elective [surgery]" such as this, in the presence of increased risk of infection from the A1C levels, "taking the time to improve that risk is the responsible standard of care," and that Dr. Rauzzino should have canceled surgery and ordered six months of conservative (i.e., physical) therapy, consistent with what Dr. Poffenbarger believed to be "the standard of care."

¶ 29   On appeal, Dr. Rauzzino contends that the evidence defied Scholle's theory that Dr. Rauzzino improperly operated in the presence of "uncontrolled" diabetes based solely on his elevated A1C levels.  In this regard, Dr. Rauzzino points to, among other

---

[5] Dr. Rauzzino agreed that elevated A1C levels present a "primary risk" of "increased" infection.

things, the fact that Scholle's blood glucose levels were within the normal range days before surgery; that a published article had said "there are no standards of care for optimal A1C levels before surgery";[6] that Scholle's PCP had cleared him for surgery; that Dr. Rauzzino had consulted the chief of medicine at the Hospital, who said Scholle's A1C levels were not a contraindication to surgery; and that he had met with Scholle before surgery, who was informed of the risks associated with his elevated A1C levels and who, after acknowledging he had elevated levels in the past, decided to proceed anyway. This "overwhelming proof," Dr. Rauzzino argues, "nullified" Dr. Poffenbarger's opinion about Dr. Rauzzino's breach of the applicable standard of care.

¶ 30    Indeed, "the evidence supporting a directed verdict must do more than contradict conflicting evidence; it must *nullify*" it. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 686 (Colo. 1998) (citation omitted); *see Gossard v. Watson*, 122 Colo. 271, 273, 221 P.2d 353, 354 (1950) (same). However, a nullification occurs

---

[6] Dr. Poffenbarger, who had also published on the topic, acknowledged that his "paper didn't say anything different." He did, however, say "[t]here is some controversy in the literature."

11

only if "no evidence received at trial, or inference therefrom, could sustain a verdict." *Tisch v. Tisch*, 2019 COA 41, ¶ 34. Only then is a trial court "justified in directing one, not because it would have the authority to set aside an opposite one, but because there was an actual defect of proof; and, hence, as a matter of law, the party was not entitled to recover." *Gossard*, 122 Colo. at 277, 221 P.2d at 356.

¶ 31 Dr. Poffenbarger's opinion may have been the "only" one[7] (as Dr. Rauzzino contends) saying that the standard of care in the presence of elevated A1C levels required a postponement of surgery. But his opinion was, nonetheless, presented to the jury and could serve as a basis for holding Dr. Rauzzino liable in connection with Scholle's injuries. *See Parks*, ¶ 9 (stating that a court shouldn't grant a motion for directed verdict "unless there is no evidence that could support a verdict against the moving party on the claim").

---

[7] Scholle's PCP testified that he would not have cleared Scholle for surgery had he known about the elevated A1C levels. However, because the PCP was not endorsed as an expert on the standard of care, he was not permitted to testify directly on that issue.

¶ 32    "[T]he question of whether a person was negligent — that is, whether [that person] breached [the] duty of care by acting unreasonably under the circumstances — is ordinarily a question of fact for the jury." *Hesse v. McClintic*, 176 P.3d 759, 764 (Colo. 2008). And it is "the jury's sole province to determine the weight of the evidence and the credibility of witnesses, and to draw all reasonable inferences of fact therefrom." *Morales v. Golston*, 141 P.3d 901, 906 (Colo. App. 2005) (identifying several inferences that the jury could have made based on the evidence presented at trial).

¶ 33    Because some evidence was presented that Dr. Rauzzino breached the applicable standard of care, the trial court properly denied Dr. Rauzzino's motion for directed verdict with respect to this part of Scholle's case.

### *2.    Use of the Medtronic Device*

¶ 34    Dr. Rauzzino also contends that Scholle did not prove that Dr. Rauzzino's use of the Medtronic device breached the applicable standard of care. Dr. Rauzzino is not entitled to relief.

¶ 35    At trial, Scholle presented evidence, through Dr. Poffenbarger, that the Medtronic device, used to stabilize the spine during the surgery, must be seated correctly (including making sure blood

13

vessels are properly out of the way) both to (1) avoid unintended injury from other tools and (2) keep unobstructed the doctor's view of the area operated on.  Further, Dr. Poffenbarger read a warning from the Medtronic's "surgeon guide" that the device must be properly seated before proceeding in the surgery and agreed when he read that "the most common and serious adverse events [as relevant here] were intraoperative vascular injuries," the exact injuries Scholle had experienced.  Scholle also presented x-ray images to the jury, which, according to Dr. Poffenbarger, showed that the Medtronic device had not been seated properly.  This was evident, Dr. Poffenbarger said, from the existence of certain gaps between the device and tissue.

¶ 36     Dr. Rauzzino asserts that Dr. Poffenbarger's testimony in this regard was fatally undermined by (1) Dr. Poffenbarger's admission, during cross-examination, that while he thought the Medtronic "device is unsafe," he "would not elevate that statement to a standard-of-care statement"; (2) Dr. Poffenbarger's knowledge that other neurosurgeons had used the device and that it was used

across the country; (3) Dr. Mark McLaughlin's[8] expert testimony that he had used the device around the same time that Dr. Rauzzino had; (4) Dr. McLaughlin's testimony that "the device that [a doctor] is comfortable with and [is] used to is usually the one that's going to get the job done as best as possible"; and, (5) Dr. McLaughlin's expert opinion, based on a review of all the materials, that Dr. Rauzzino "did not" do anything negligently which caused Scholle's injuries.

¶ 37 In denying Dr. Rauzzino's motion for directed verdict on this issue, the court stated there was "plenty of evidence that even if it wasn't improper to use the device, how the device was used was improper."

¶ 38 The trial court correctly distinguished between issues of (1) negligence in the mere use of a Medtronic device — which was not the theory upon which Scholle proceeded; and (2) negligently misusing the device — which was Scholle's theory. Because Scholle presented evidence that Dr. Rauzzino had misused the device, the trial court properly denied the motion for directed verdict with

---

[8] Dr. McLaughlin, a neurosurgeon, was Dr. Rauzzino's expert.

15

respect to this part of Scholle's case. *See Tisch,* ¶ 34 (A directed verdict is proper only if "no evidence received at trial, or inference therefrom, could sustain a verdict.").[9]

## C.    The Hospital

¶ 39    The Hospital contends that the trial court erred by denying its motion for directed verdict because (1) it did not breach any duty to provide adequate blood products, regardless of whether a massive transfusion protocol (MTP) was activated; (2) it had no duty to stock EVAR arterial stents; and (3) any negligence on its part was not a proximate cause of Scholle's injuries.

---

[9] Dr. Rauzzino posits a third ground for challenging the court's denial of the motion for directed verdict, that is, that Scholle presented no proof that he'd breached the applicable standard of care by having a PA assist him during surgery. So far as we can discern, however, Scholle never presented or argued that to the jury as a theory of liability. True, at one point an issue was raised whether Scholle had given "informed consent" to the participation of a PA during surgery. But the evidence (a signed "informed consent" document) showed that Scholle had done so, and the jury found that neither Dr. Rauzzino nor Dr. Ehrichs was liable for negligence based on Scholle's lack of informed consent. Because we are unable to discern any other proffered theory of potential liability based on the involvement of the PA, we do not discuss the issue further.

¶ 40    To succeed on an institutional negligence claim against the Hospital, "a plaintiff must prove that (1) the hospital had a legal duty to conform to a certain standard of conduct; (2) the hospital breached that duty; (3) the plaintiff was injured; and (4) there was a causal connection between the hospital's alleged negligent conduct and the resulting injury." *Settle v. Basinger*, 2013 COA 18, ¶ 58 (analyzing a claim of negligent credentialing).

¶ 41    "Proving breach of a duty of care gets a plaintiff only halfway home on a negligence claim. The plaintiff must also prove that the breach of duty caused the claimed injury." *Garcia v. Colo. Cab Co. LLC*, 2021 COA 129, ¶ 36. "This requirement has two parts: the plaintiff must prove both 'cause in fact' and 'proximate' or 'legal' cause." *Id.* (quoting *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 2020 CO 51, ¶ 27).

¶ 42    The test for cause-in-fact, commonly known as the "but for" test, is "whether, but for the alleged negligence, the harm would not have occurred," that is, whether the negligent conduct in a "natural and continued sequence, unbroken by any efficient, intervening cause," produced the alleged injury. *Rocky Mountain Planned Parenthood*, ¶ 28 (quoting *N. Colo. Med. Ctr., Inc. v. Comm. on*

*Anticompetitive Conduct*, 914 P.2d 902, 908 (Colo. 1996)); *see Groh v. Westin Operator, LLC*, 2013 COA 39, ¶ 50 (Causation may be found where the negligent actor "sets in motion a course of events" that leads to the plaintiff's injury.), *aff'd*, 2015 CO 25.

¶ 43     The test for "proximate" or "[l]egal" cause "depends largely on the question of the foreseeability of the harm." *Rocky Mountain Planned Parenthood*, ¶ 30.  To prove proximate cause, "the plaintiff must establish that the harm incurred was a 'reasonably foreseeable' consequence of the defendant's negligence." *Deines v. Atlas Energy Servs., LLC*, 2021 COA 24, ¶ 13.  Proximate cause may be established, though, "even where the actor did not and could not foresee the precise way the injury would come about." *Id.*

### 1.     Blood Products Theory

¶ 44     The Hospital does not dispute that it had a legal duty to have adequate blood products on hand to respond to an emergency involving the excessive loss of blood during surgery.  But, it says, Scholle's claims against the Hospital were premised on facts demonstrably proven to be false.

¶ 45     In this regard, the Hospital insists that Scholle's experts assumed that an MTP had been activated, but every individual

18

involved in the transfusion and/or was present in the operating room who was deposed or testified at trial said otherwise.

¶ 46    Further, although Scholle's experts opined that the Hospital had failed to supply enough blood products for the transfusion, the anesthesiologist in charge of Scholle's transfusion testified that he always had a supply of blood products he needed when he needed them; that he never had to wait to receive a requested product; and that he was never told by anyone that the Hospital didn't have stock of a blood product or that one of his requests would be delayed.

¶ 47    But Scholle points out that he presented contradictory evidence, or evidence of circumstances from which the jury could infer, that the Hospital was negligent in this regard:

- One doctor who responded to the emergency room initially said that he'd been told upon arrival that personnel were operating under an MTP; it was only later, after discussing the matter with defense lawyers, that he said "this might not have been true."

- One of Scholle's experts, an anesthesiologist, testified that, given the circumstances, the MTP should have been activated.

- That anesthesiologist testified that (1) he performs blood transfusions similar to the one Scholle received and (2) in his experience under an MTP, blood products are delivered in such a way that, even though the blood is divided into its products (i.e., red blood cells, platelets, and plasma, and cryoprecipitate), it is administered to the patient in proper ratios as if it were whole blood.

- Scholle's expert anesthesiologist said that the MTP is designed to deliver proper blood ratios to minimize the hypothermia, acidosis, and coagulopathy, thereby preventing subsequent problems such as organ malfunction caused by a lowered body temperature, heart malfunction and failure of oxygen delivery from the blood caused by increased levels of acid and increasing severity of these problems caused by the blood's failure to clot (i.e., and continuing to bleed out).

- According to the expert, during Scholle's surgery, the Hospital's blood bank did not deliver the blood products in this ratio: it instead delivered blood in ratios different than those required during an MTP.

- The anesthesiologist opined that incorrect ratios of blood were delivered to the operating room because the blood bank did not have all of the right blood products in stock.[10]

- That expert answered yes to counsel's question whether the Hospital's response under the MTP "fell below the standard of care."

- The same expert also testified that Scholle was losing blood faster than the team could administer it, which caused Scholle to experience hypothermia, acidosis, and coagulopathy (improper clotting).

- Scholle's nephrologist, who treated Scholle's subsequent kidney injuries, explained that "whenever there is massive blood loss," as in Scholle's case, kidney cells are "slough[ed] off," which can lead to acute tubular necrosis.

---

[10] Similarly, a blood bank employee at the Hospital testified that, in one instance, about forty-five minutes of time elapsed between receiving an order for plasma and having compatible plasma available (because it was being delivered, needed to be thawed, and the thawing machine was already at capacity).

- Although hospital rules required documenting "complications" and "untoward events," a nurse shredded "pick" and "preference" sheets documenting the requested hospital equipment and what happened in the operating room.

¶ 48    In our view, the above-recounted evidence was sufficient to support a reasonable conclusion that the Hospital breached its duty to have available and to timely provide appropriate blood products for Scholle's emergency room surgery, and that Scholle's injuries were a reasonably foreseeable consequence of that breach.  Thus, the trial court properly denied the Hospital's motion for directed verdict on this ground.

## 2.    *Stent Theory*

¶ 49    The Hospital contends that the evidence failed to establish that it was negligent in failing to stock, or have a policy in place to timely procure, the EVAR kit that was ultimately used to repair the injury to Scholle's iliac vein.  The expert opinion evidence offered in support of Scholle's "stent theory," it says, was "lacking in probative value" because it conflicted with the opinions of the Hospital's experts as well as with evidence that (1) very few hospitals stocked

the kits (during the emergency, hospital staff called six to eight different facilities, and only one of them had a kit in stock); and (2) the Hospital could not be expected to stock EVAR kits because it did not have an AAA repair program that would have used the kits.

¶ 50 But the credibility of witnesses, and the effect and weight of conflicting and contradictory evidence, are all questions of fact for a jury to resolve, rather than questions of law to be resolved in ruling on a motion for directed verdict. *See Park Rise Homeowners Ass'n v. Res. Constr. Co.*, 155 P.3d 427, 432 (Colo. App. 2006).

¶ 51 Scholle presented expert opinion that a hospital of the Hospital's size with a vascular surgeon and an emergency room treating patients with ruptured abdominal aortic aneurysms should have foreseen the need for, and thus stocked, the kit.

¶ 52 Further, Scholle presented the following evidence that the Hospital's failure to stock the EVAR kits was a proximate cause of Scholle's injuries:

- One of the surgeons who helped to repair Scholle's vein agreed when counsel asked whether a "delay of an hour and 45 minutes" while waiting for the EVAR kits "cause[d] injury" to Scholle.

23

- Scholle's expert in healthcare administration agreed when counsel asked whether the delay was "a cause of injury to" Scholle.

¶ 53    In resolving this part of the Hospital's motion for directed verdict, the trial court observed that the evidence was "wafer thin" and "very, very thin." Nonetheless, the court still perceived that there was "sufficient evidence" to go to the jury.

¶ 54    We agree with the trial court. Even though the defendants introduced evidence that hemostasis (i.e., cessation of bleeding) was achieved while the EVAR kits were en route, a reasonable inference could be made that, but for the kits not being immediately in stock and available, the length of time that Scholle was experiencing massive blood loss would have been less, and, consequently, he would not have been injured to the extent he was.

¶ 55    Because reasonable minds could draw more than one inference from the evidence, *Garcia*, ¶ 38, once again, it was for the jury to resolve the conflicts in (and conflicting inferences from) the evidence, *Walker v. Ford Motor Co.*, 2015 COA 124, ¶ 38, *aff'd on*

*other grounds*, 2017 CO 102.  Consequently, the Hospital was not entitled to a directed verdict on this ground either.[11]

### IV.  Jury Instructions

¶ 56    The defendants next contend that the trial court reversibly erred by instructing the jury on (1) physical impairment as a category of damages separate and apart from noneconomic damages; (2) the "thin skull" doctrine; and (3) negligence per se on the part of the Hospital.  We disagree.

¶ 57    "Trial courts have a duty to correctly instruct juries on matters of law."  *Vititoe v. Rocky Mountain Pavement Maint., Inc.*, 2015 COA 82, ¶ 67 (quoting *Bedor v. Johnson*, 2013 CO 4, ¶ 8).  Trial courts should not, however, "instruct on abstract principles of law unrelated to the issues in controversy, nor on statements of law

---

[11] The Hospital also argues, in a cursory manner, that reversal is required because Scholle's claim for negligence per se failed to state a claim as a matter of law because the regulations on which the claim was based are not "public safety" measures.  However, inasmuch as the Hospital did not raise that argument in its motion for directed verdict, we decline to address it.  *See Flores v. Am. Pharm. Servs., Inc.*, 994 P.2d 455, 457-58 (Colo. App. 1999) ("C.R.C.P. 50, in part, provides that a motion for a directed verdict shall state the specific grounds therefor.  An appellate court will not consider issues, arguments, or theories not previously presented in trial proceedings.").

which are incorrect or misleading." *People v. Alexander*, 663 P.2d 1024, 1032 (Colo. 1983) (citations omitted).

¶ 58     We review the instructions de novo to determine whether they correctly state the law. *Vititoe*, ¶ 67. If they do, we then review the trial court's decision to give a particular instruction for an abuse of discretion. *Id.* "A trial court abuses its discretion only when its ruling is manifestly arbitrary, unreasonable, or unfair, or the instruction is unsupported by competent evidence in the record." *Id.*

### A.     Physical Impairment and Disfigurement as a Separate Category of Damages

¶ 59     The defendants assert that the trial court erred by instructing the jury that "permanent impairment and disfigurement"[12] was a separate category from "non-economic damages" — which Scholle had disavowed any interest in recovering. We conclude that reversal is not warranted.

¶ 60     Initially, the trial court

---

[12] The trial court did not instruct the jury in terms of "*permanent* impairment and disfigurement;" rather, it used the terms "*physical* impairment and disfigurement." (Emphases added.)

- informed the jury, in Instruction Number 19, that it could consider damages for three categories of injuries: (1) "*noneconomic injuries*," including "inconvenience, emotional stress, and impairment of the quality of life"; (2) "economic injuries," including "loss of earnings or damage to his ability to earn money in the future [and] reasonable and necessary medical, hospital, and other expenses"; and (3) "*physical impairment or disfigurement*" (emphases added); and

- gave the jury a verdict form, with instructions to enter the total amount of injuries, damages, or losses, if any, in each of four categories: (1) "Medical or other health care expenses"; (2) "Lost earnings (and lost earning capacity)"; (3) "Other economic losses than those included [in the prior two categories]"; and (4) "Non-economic losses, including inconvenience, emotional stress, and impairment of the quality of life."

¶ 61    "Under Colorado common law, damages for physical impairment and disfigurement have historically been recognized as a separate element of damages." *Pringle v. Valdez*, 171 P.3d 624,

27

630 (Colo. 2007). But under the HCAA, damages for physical impairment and disfigurement fall within the "[d]irect noneconomic loss or injury" category of damages. § 13-64-302(1)(II)(A), C.R.S. 2021; *see Pringle*, 171 P.3d at 631 (noting that "physical impairment and disfigurement damages [are] among those claims subject to the HCAA's noneconomic damages cap").

¶ 62     Damages for pain and suffering are a subset of damages for noneconomic injury. *See* § 13-21-102.5(b), C.R.S. 2021; *Pringle*, 171 P.3d at 625. After Scholle's counsel, on several occasions, disavowed any interest in recovering damages for pain and suffering, the court planned to tell the jury that noneconomic damages had been mistakenly included in Instruction Number 19 and the verdict form, and that the jurors were "not to consider" them. Before the court could do so, however, another of Scholle's attorneys argued that the jury could consider noneconomic damages. Consequently, the court left the verdict form and the instructions "the way they are."

¶ 63     The jury awarded monetary amounts on the verdict form only for "Medical and other health care expenses" and "Lost earnings

(and lost earning capacity)"; it awarded $0 in damages for "other economic losses" and "non-economic losses."

¶ 64    On appeal, the defendants assert that (1) given Scholle's waiver of the right to recover noneconomic damages, there was no reason to instruct the jury on noneconomic damages, including permanent impairment and disfigurement; and (2) informing the jury that it could consider physical impairment and disfigurement as a separate category of damages, without, however, providing a place on the verdict form for this "separate" category of damages, injected confusion and uncertainty into the verdict.

¶ 65    We agree that where, as here, the HCAA applies, the trial court should not have informed the jury that physical impairment and disfigurement is a separate category of damages; a court should, instead, reference it, if at all, under the noneconomic category of damages.

¶ 66    That said, the court's error does not warrant reversal.

¶ 67    A "court's erroneous provision of an instruction is reversible error only if the error prejudiced a party's substantial rights. Such prejudice occurs where the jury might have returned a different

29

verdict had the court not given the improper instruction."
*McLaughlin v. BNSF Ry. Co.*, 2012 COA 92, ¶ 32 (citations omitted).

¶ 68 Here, the court's error in making "physical impairment and disfigurement" damages a separate category of damages, and, even in including a "noneconomic damages" category at all, was harmless, given the jury's award of "$0" in noneconomic damages.

¶ 69 We reject the defendants' additional argument that the jurors may have awarded physical impairment and disfigurement damages as "medical and health expenses." As Scholle argues, however, "the court told jurors [in Instruction Number 19] that any physical impairment damages 'shall not include damages again for losses or injuries already determined under either numbered paragraph 1 or 2 above" (which included "necessary medical, hospital, and other expenses"). Absent a showing to the contrary (which is not made here), we must presume that the jury understood and followed the court's instruction. *See People v. Licona-Ortega*, 2022 COA 27, ¶ 91.

### B. The "Thin Skull" Doctrine

¶ 70 The defendants also contend that the trial court erroneously gave the jury a "thin-skull plaintiff" instruction.

30

¶ 71    Over the defendants' objection, the trial court instructed the jury that

> In determining the amount of Plaintiff's actual damages, you cannot reduce the amount of or refuse to award any such damages because of any physical frailties or illness, including diabetes, of the Plaintiff that may have made him more susceptible to injury, disability, or impairment than an average or normal person.[13]

¶ 72    On appeal, the defendants contend that this was error. We disagree.

¶ 73    "Under Colorado law, it is fundamental that a tortfeasor must accept his or her victim as the victim is found." *Schafer v. Hoffman*, 831 P.2d 897, 900 (Colo. 1992). "Thus, a tortfeasor is fully liable for any damages resulting from its wrongful act even if the victim had a pre-existing condition that made the consequences of the wrongful act more severe for him than they would have been for a person without the condition." *McLaughlin*, ¶ 35.

¶ 74    A "thin skull" or "eggshell plaintiff" instruction is appropriate in tort cases "when the defendant seeks to avoid or reduce liability

---

[13] This part of Instruction Number 20 was patterned after CJI-Civ. 6.7 (2019).

by employing a technique known as 'spotlighting,' in which the defendant calls attention to the plaintiff's pre-existing conditions or predisposition to injury and asserts that the plaintiff's injuries would have been less severe had the plaintiff been an average person." *State Farm Mut. Auto Ins. Co. v. Pfeiffer*, 955 P.2d 1008, 1010 (Colo. 1998); *accord Kildahl v. Tagge*, 942 P.2d 1283, 1286 (Colo. App. 1996) ("A 'thin skull' instruction is appropriate when a defendant seeks to avoid liability by asserting that the victim's injuries would have been less severe had the victim been an average person.").

¶ 75　　The defendants do not contest the correctness of the law stated in the court's "thin skull" instruction.  But, they assert, the instruction conveyed to the jury only abstract principles of law unrelated to the issues in controversy.  This follows, they say, because they did not call attention to Scholle's diabetes or any other infirmity as a means of avoiding or reducing damages.  Instead, it was Scholle himself who introduced evidence of his diabetes, in connection with his claim that, given his condition, Dr. Ehrichs and Dr. Rauzzino should not have gone ahead with elective surgery that day.

¶ 76    The defendants are largely — but not entirely — correct about what happened during trial. As Scholle asserts, at one point, a defense attorney asked one of Scholle's experts on cross-examination, "so patients whose diabetes is not under good control are at greater risk of developing neuropathy; is that correct?" The defendants attempt to deflect the significance of the question by saying, essentially, that Scholle's expert said he couldn't give an answer. Still, the question was directed at determining whether Scholle's diabetes increased the likelihood of experiencing injuries for which he sought damages. Thus, it was subject to being interpreted as an attempt to avoid or reduce damages for injuries that "an average or normal person" would not have experienced.

¶ 77    Because that one question raised "thin skull" issues, the court did not abuse its discretion by giving the jury a "thin skull" instruction.

¶ 78    Moreover, even if we were to assume the trial court erred in giving the instruction, "[t]he court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." C.R.C.P. 61. The

33

burden of showing reversible error is on the party asserting it.
*Tech. Comput. Servs., Inc. v. Buckley*, 844 P.2d 1249, 1256 (Colo.
App. 1992). Yet, in their opening briefs, the defendants make no
attempt to demonstrate how they may have been prejudiced as a
result of the instruction. All they argue is that "there was no reason
nor legal basis to give a thin skull instruction and the giving of the
instruction constituted reversible error."

¶ 79 We recognize that "there can be prejudice from unsupported
instructions because the jury is likely to try to fit facts into an
erroneously given instruction." *Castillo v. People*, 2018 CO 62,
¶ 61. But it is not apparent to us how the defendants would have
been prejudiced by the "thin skull" instruction. It did not
encourage the jury to render a verdict based on sympathy or
prejudice; it told the jurors only that they could not reduce
damages because of Scholle's condition — not that they were
permitted to increase damages because of those conditions. *See*
*O'Neal v. Bd. of Cnty. Comm'rs*, No. 16-CV-01005-TMT-KLM, 2020
WL 2526782, at *10 (D. Colo. May 18, 2020) (unpublished order).

¶ 80 In any event, "it is not this court's function to speculate as to
what a party's argument might be. Nor is it our proper function to

34

make or develop a party's argument when that party has not endeavored to do so itself." *Beall Transp. Equip. Co. v. S. Pac. Transp.*, 64 P.3d 1193, 1196 n.2 (Or. Ct. App. 2003). "If [the defendants] wanted a weightier resolution of the issue, [they] should have mounted a weightier contention. Gravitas begets gravitas." *CSX Transp., Inc. v. Miller*, 858 A.2d 1025, 1083 (Md. Ct. Spec. App. 2004); *see also Redden v. Clear Creek Skiing Corp.*, 2020 COA 176, ¶ 21 (citing, with approval, this proposition from *CSX Transp.*).

### C. *Negligence Per Se*

¶ 81    Finally, the Hospital contends that the court incorrectly provided a negligence per se instruction to the jury. We conclude that reversal is not required.

¶ 82    The trial court informed the jury, in Instruction Number 16, that

> At the time of the occurrence in question in this case, the following regulations of the State of Colorado were in effect:
>
> - Hospitals must implement written policies and procedures to provide for the safety and welfare of the occupants of their respective facilities.
>
> - Hospitals must maintain a complete and accurate medical record on every patient

35

from the time of admission through discharge.

- Hospitals must provide for the procurement, storage, and transfusion of blood as needed for routine and emergency cases.

- Hospitals must keep records which show the complete receipt and disposition of blood.

A violation of one or more of these ordinances constitutes negligence as defined in Instruction No. 15.

If you find such a violation, you may only consider it if you also find that it was a cause of the Plaintiffs claimed injur[ies], damages, and/or losses.

¶ 83 On appeal, the Hospital contends that the trial court erred by giving the jury that instruction because the regulations the court used in crafting that instruction cannot, as a matter of law, serve as the basis for a negligence per se claim. That's because, it says, the regulations at issue were adopted primarily for "licensure" reasons and not, as required, for "the public's safety." *See Smith v. Surgery Center at Lone Tree, LLC*, 2020 COA 145M, ¶ 39.

¶ 84 But that was not the argument that the Hospital made in the trial court. In the trial court, the Hospital objected on the following grounds to any consideration of a negligence per se claim: it wasn't

pleaded, it didn't fit the facts of the case, the regulations didn't provide for a standard of care in a professional medical malpractice case, and, finally, that "a three-pronged test . . . needs to be articulated before negligence per se can be established," and that "was[n't] done." At no time did the Hospital argue that the regulations were adopted primarily for "licensure," rather than "public safety," reasons.

¶ 85    "Because [the Hospital] did not object on this ground at trial, we decline to address this new argument." *Peiffer*, 955 P.2d at 1010 n.3; *see Brown v. Am. Standard Ins. Co.*, 2019 COA 11, ¶ 21 ("[I]ssues not raised in or decided by the trial court generally will not be addressed for the first time on appeal."); *O'Connell v. Biomet, Inc.*, 250 P.3d 1278, 1282 (Colo. App. 2010) ("[W]hen a party fails to assert an argument in the trial court but raises it for the first time on appeal, the assertion is deemed waived."); *see also* C.R.C.P. 51 (stating that the parties must object to jury instructions prior to submission of the instructions to the jury, and that "[o]nly the

grounds so specified shall be considered on . . . appeal or certiorari").[14]

¶ 86    We also reject the Hospital's request that we review its unpreserved argument under a plain error standard.  Appellate courts apply plain error only in the "'rare' civil case, involving 'unusual or special' circumstances — and even then, only 'when necessary to avert unequivocal and manifest injustice.'"  *Wycoff v. Grace Cmty. Church of Assemblies of God*, 251 P.3d 1260, 1269 (Colo. App. 2010) (quoting *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1195 (Colo. App. 2009)).

---

[14] The Hospital argues that we should nonetheless consider the issue preserved for review, consistent with *Silva v. Wilcox*, 223 P.3d 127, 134-35 (Colo. App. 2009), where a division of this court found a "general objection" sufficient to preserve a challenge to a negligence per se instruction based on "the context of the parties' continuing dispute and the trial court's consideration of both the statutes and the ordinance."  We read *Silva* to mean that, although the objection in the trial court was not made with the precision with which it was presented on appeal, the gist of the objection presented on appeal would nonetheless have been apparent to the court.  That is not, in our view, the situation here.

¶ 87    This is not, in our view, one of those "rare" cases — involving unusual circumstances and necessary to avert unequivocal injustice — calling for plain error review.

## V.    *The Jury's Award of Damages*

¶ 88    The defendants contend that the jury's award of economic damages is, in several respects, unsupported by the evidence.[15] More specifically, they argue that the trial court erred in refusing to strike (1) $1.4 million of Scholle's claimed past medical expenses, for lack of evidence as to their reasonableness, necessity, and causation; and (2) $456,848 in past medical expenses, as lacking any evidentiary support.  We decline to address the merits of the $1.4 million issue because the defendants have failed to adequately brief that issue.  But, as for the $456,848 in past medical expenses,

---

[15] Each of the defendants filed its or his own opening brief.  In a pattern repeated throughout the briefs, however, one of the defendants (in this instance, Dr. Ehrichs) argued a point, and the other two defendants summarily joined in that argument.  This manner of proceeding is highly questionable under C.A.R. 28(h) (stating that "any party may adopt by reference any part of another's brief, but a party may not both file a separate brief and incorporate by reference the brief of another party").

we conclude that Scholle did not present sufficient evidence to sustain that part of the award.

## A. The $1.4 Million Figure

¶ 89 The defendants assert that the trial court should have granted their motion for directed verdict with respect to $1,483,495 in past medical expenses because Scholle did not present any proof that those expenses were reasonable or causally related to any negligence.

¶ 90 But as Scholle points out, the defendants did not identify in their opening briefs which $1,483,495 of Scholle's claimed $5.5-to-$6 million in medical expenses were contested. It is not enough to identify the contested expenses for the first time in a reply brief. *See In re Marriage of Dean*, 2017 COA 51, ¶ 31 ("We do not consider the arguments mother makes for the first time in her reply brief or those that seek to expand upon the contentions she raised in her opening brief."). Nor is it enough simply to cite to portions of the record (i.e., transcripts, motions) where the arguments were identified for the trial court. *See Gravina Siding & Windows Co. v. Frederiksen*, 2022 COA 50, ¶ 70 n.13 ("This attempt to incorporate by reference arguments made in the trial court improperly 'attempts

to shift — from the litigants to the appellate court — the task of locating and synthesizing the relevant facts and arguments' and 'makes a mockery' of the rules that govern the length of briefs." (quoting *Castillo v. Koppes-Conway,* 148 P.3d 289, 291 (Colo. App. 2006))).

¶ 91    The parties are "responsible for advancing the facts and arguments entitling them to relief." *Compos v. People,* 2021 CO 19, ¶ 35 (quoting *Greenlaw v. United States,* 554 U.S. 237, 243-44 (2008)).  Because the defendants' argument has not been properly presented to us on appeal, we decline to address it.  *See Pastrana v. Hudock,* 140 P.3d 188, 189 (Colo. App. 2006) ("[W]e will not search the record for evidence to support allegations of error."); *Brighton School Dist. 27J v. Transamercia Premier Ins. Co.,* 923 P.2d 328, 335 (Colo. App. 1996) ("[I]t is not the duty of the reviewing court to search the record for evidence to support bald assertions.").

### B.    The $456,848 Figure

¶ 92    This issue turns on exactly which summary exhibit was admitted into evidence.  The defendants point to "Exhibit 486," which they say was admitted (through Scholle's testimony) and which shows a total of only $5,543,152 in past medical expenses.

But Scholle, on appeal, cites to a different version of Exhibit 486 (the one labeled "Updated 11/05/2019") that was supposedly admitted and shows a total of $6,014,668.31 in past medical expenses.

¶ 93 Determining who is correct here is not without difficulty. The record is far from clear as to what version of Exhibit 486 was the final one admitted at trial.

¶ 94 We can say what the record is clear about, though, and draw some logical conclusions from it.

¶ 95 The record reflects that both Scholle *and* the defendants uploaded "Exhibit – 486," with the label "(Updated 11/05/2019)," into the supplemental record on appeal; the uploaded Exhibit – 486 shows a total of $6,014,668.31 in past medical expenses.

¶ 96 But when Scholle testified, he said that Exhibit 486 "did not include any bills" for "diabetes" or "hypertension or cholesterol," and that he'd taken "out from the [Hospital] bills the cost of the original August 26, 2015, surgery" and a "back revision" occurring on November 11, 2015. Counsel then attempted to ask, "And those — taking out those bills, they totaled $477,000—" as a specific total dollar amount of bills that were excluded, when a defense attorney

objected on foundation and relevance grounds.[16]  The court decided that Scholle could testify as to what the bills were for but was "not going to let [Scholle's counsel] lead him through what the amounts are[.]"

¶ 97    Simple math shows that $6,014,668.31 minus the approximate figure of $477,000 that counsel was talking about equals $5,537,668.30 — a figure very close to the $5,543,152 figure appearing on the defendants' version of Exhibit 486.

¶ 98    In closing argument, Scholle's counsel pointed to Exhibit 486, saying (1) Exhibit 486 was "the past medical [expenses] alone since August 26, 2015[, which were] 5.5 million dollars"; and, (2) a few pages of transcript later, that the total amount of expenses from the expert report "was $5,543,151.74. . . .  And you [i.e., the jury] can take that forward as you see fit."  Further, in a responsive brief post-trial, the defendants stated that during closing argument, Scholle's counsel handwrote this number "on the exemplar jury form."

---

[16] We acknowledge that, since counsel was cut off mid-sentence, the "477,000" number is approximate.

¶ 99    On appeal, Scholle asserts that his counsel simply referenced the wrong exhibit in closing argument. But the combination of Scholle's testimony, simple math, and Scholle's closing argument lead us to conclude that the "final" Exhibit 486 admitted into evidence was the one to which the defendants direct this division's attention.

¶ 100    Consequently, because the evidence would support only an award of $5,543,151.74, the jury's award of $6 million must be reduced (by $456,948) to that amount.[17]

### VI.    Trial Court's Entry of Judgment

¶ 101    The defendants also contend the trial court erred by (1) including prefiling interest in excess of the HCAA's damages cap; (2)

---

[17] We reject, however, the defendants' separate assertion that Scholle should not have been awarded the full amount of future damages because, according to them, (1) Scholle's "life care plan" included $1,180,400 in identified (but unnecessary) items; and (2) $383,411 in duplicative, future lost earnings. But, as Scholle points out, the defendants' arguments overlook (1) the economic catastrophe Scholle and his family suffered; (2) evidence that Scholle's health needs would increase over time; and (3) the trial court's recognition that the jury awarded Scholle distinct amounts for "future medical and other health care expenses" and "future lost earnings and lost earning capacity. *See Pressey v. Children's Hosp.*, 2017 COA 28, ¶ 47, *overruled on other grounds by Rudnicki v. Bianco*, 2021 CO 80.

concluding that good cause existed to exceed the HCAA's $1 million damages cap, and without properly applying the HCAA's collateral source provision; and (3) not entering judgment *nunc pro tunc*. We address each contention in turn.

### A. The HCAA's Damages Cap

¶ 102 The General Assembly enacted the HCAA to "assure the continued availability of adequate health care services to the people of this state by containing the significantly increasing costs of malpractice insurance . . . ." § 13-64-102(1), C.R.S. 2021. In furtherance of that purpose, the HCAA presumptively caps the total damages a plaintiff can recover on a medical malpractice claim to $1 million ($300,000 of which can be noneconomic damages). § 13-64-302(1)(b), (1)(c).

### B. Prefiling Interest

¶ 103 The defendants contend that the trial court erred in including $1,429,832 in prefiling, prejudgment interest from the date of Scholle's surgery (August 26, 2015) to the date he filed his complaint (May 11, 2017) in a judgment in excess of the HCAA's damages cap.

¶ 104    Section 13-21-101(1), C.R.S. 2021, governs interest on damages in all personal injury actions: a plaintiff may claim interest on damages from the date the action accrues until the date the suit is filed (prefiling interest) and from the date the suit is filed to the date judgment is satisfied (post-filing interest).

¶ 105    Section 13-64-302(2), however, provides that

> prejudgment interest awarded pursuant to section 13-21-101 that accrues during the time period beginning on the date the action accrued and ending on the date of filing of the civil action *is deemed to be part of the damages awarded* in the action for the purposes of this section *and is included within each of the limitations on liability* that are established pursuant to subsection (1) of this section.

(Emphases added.)

¶ 106    According to the defendants, under this statute, "Scholle may not recover prefiling interest in excess of the HCAA's damage caps under any circumstances."  We do not agree.

¶ 107    Damages are capped under the HCAA, subject to being uncapped upon a showing of "good cause" and "unfair[ness]."  § 13-64-302(1)(b), (1)(c).  Prefiling, prejudgment interest is part of damages.  § 13-64-302(2).  As a matter of pure logic, then, prefiling, prejudgment interest is part of "damages" capped under the HCAA,

46

subject to being uncapped upon a showing of good cause and unfairness — unless there's another statute saying otherwise. There is no statute — nor case law[18] — saying otherwise.

¶ 108    Consequently, the trial court did not err by considering the prefiling, prejudgment interest as part of the damages award, subject to being uncapped upon a showing of "good cause" and "unfairness."

### C.    Exceeding the HCAA's Damages Cap and Collateral Source Considerations

¶ 109    Section 13-64-302(1)(b) provides that

> if, upon *good cause shown*, the court determines that the present value of past and future economic damages would exceed [the $1 million] limitation and that *the application of such limitation would be unfair*, the court may award in excess of the limitation the present value of additional past and future economic damages only.

(Emphases added.)

---

[18] As Scholle points out, the cases on which the defendants rely — *Ochoa v. Vered*, 212 P.3d 963 (Colo. App. 2009), and *Wallbank v. Rothenberg*, 74 P.3d 413 (Colo. App 2003) — involved appeals from damage awards that the trial court had capped after finding no good cause to exceed the cap.

¶ 110    In considering this provision, a division of our court, in

*Wallbank v. Rothenberg*, 140 P.3d 177, 180 (Colo. App. 2006),

equated (1) "good cause" with a "substantial or legal justification, as

opposed to an assumed or imaginary pretense"; and (2) "unfair"

with "marked by injustice, partiality, or deception." (Citations

omitted.) And because the statute doesn't "specify factors that a

trial court must consider when determining whether a movant has

shown good cause or unfairness," the division held that "a court

may exercise its discretion to consider factors it deems relevant

when determining whether the movant qualifies for . . . [an]

exception to the cap." *Id.* at 180-81.

¶ 111    Scholle had the burden of establishing good cause and

unfairness under the statute. *Id.* at 180. According to the

defendants, Scholle provided no justification for an award in excess

of the damages cap beyond saying his damages were supported by

the evidence.

¶ 112    That's not what the record reflects. In a written order, the trial

court found that, under the totality of the circumstances, good

cause existed for endorsing the jury's award in excess of the

statutory cap because (1) the amount of the award was supported

by "credible, unrefuted evidence at trial"; (2) it would be "fundamentally unfair" to limit the amount of damages due to the "calamity" that occurred; (3) the medical costs imposed "a significant financial burden" on Scholle and his family, as he was the primary earner and had two minor children at home; (4) though Scholle was fifty-seven years old, he sustained permanent injuries which would prevent him from ever returning to a "career that he enjoyed deeply"; (5) medical costs would "escalate" and would "only increase over time" through the end of Scholle's life; and (6) considering that the bulk of these costs were "already-incurred medical costs," Scholle and his family lacked the means to earn sufficient income to pay off those costs.

¶ 113    Here, there is no question but that the first five factors relied on by the trial court were proper, supported by the record, and sufficient to support the entry of judgment in excess of $1 million.

¶ 114    But what about the sixth factor of Scholle having to repay "already-incurred" costs?  Was it properly considered, and, if not, does it call into question the propriety of the judgment entered by the court?

¶ 115    A court abuses its discretion when it gives significant weight to an improper or irrelevant factor, *see, e.g., City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 785 F.3d 1207, 1210-11 (8th Cir. 2015), or when it relies on factual assertions not supported by the record, *Medina v. Conseco Annuity Assurance Co.*, 121 P.3d 345, 347 (Colo. App. 2005).

¶ 116    The HCAA "eliminates, to the extent possible, the likelihood that health care providers will pay out large sums of money for losses that will never actually be sustained by the tort victim." *Hill v. United States*, 81 F.3d 118, 120 (10th Cir. 1996). It does so, in part at least, by requiring that, "[b]efore entering final judgment, the court . . . determine the amount, if any due [to a] third party payer or provider and enter . . . judgment in accordance with such finding." § 13-64-402(3), C.R.S. 2021.

¶ 117    Here, although Scholle served notice on third-party payers or providers, as required by the HCAA under section 13-64-402(1), none of them filed a "written notice of [a] subrogated claim," as required by section 13-64-402(2). The failure to file a notice of a subrogation claim "shall constitute a waiver of such right of subrogation as to such action" under section 13-64-402(2).

50

¶ 118    Courts may (and regularly do), however, address the impact of waived claims on the rights of others.  The defendants assert that because third-party payers' or providers' waiver of subrogation claims bars those parties' ability to recover anything else from Scholle, the court should have taken into account that Scholle owed them nothing further.

¶ 119    Scholle asserts otherwise, relying on a holding from a division of this court that the contract exception to the collateral source statute applies to post-verdict proceedings seeking the reduction of damages in medical malpractice actions.  *See Pressey v. Children's Hosp.*, 2017 COA 28, ¶¶ 17-22, *overruled on other grounds by Rudnicki v. Bianco*, 2021 CO 80.

¶ 120    A collateral source is "a person or company, wholly independent of an alleged tortfeasor, that compensates an injured party for that person's injury."  6 David R. DeMuro, *Colorado Practice Series: Civil Trial Practice* § 12.4, Westlaw (2d ed. database updated Aug. 2021) (quoting *Smith v. Kinningham*, 2013 COA 103, ¶ 13).  A collateral source is typically an entity such as an insurance company or employer.  *Id.*

¶ 121 To prohibit, in some circumstances, a plaintiff's double recovery, the General Assembly legislatively enacted a "collateral source" rule, which allows the court, after the jury has returned its verdict stating the amount of damages to be awarded, to reduce the amount of the verdict by the amount the plaintiff was indemnified by a third party. § 13-21-111.6, C.R.S. 2021. The statute, however, has an important exception (the contract exception):

> the verdict shall not be reduced by the amount by which such person . . . has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person.

*Id.*

¶ 122 The contract exception to the legislature's collateral source rule "prevent[s] a windfall to a tortfeasor when a plaintiff receive[s] benefits arising out of the plaintiff's contract." *Volunteers of Am. Colo. Branch v. Gardenswartz,* 242 P.3d 1080, 1085 (Colo. 2010). But it

> does not necessarily result in a plaintiff receiving a double recovery because the plaintiff must often subrogate the party with whom they contracted. In a typical subrogation framework, an insurer pays for the injured plaintiff's medical costs up front,

52

the plaintiff collects the cost of the treatment from the tortfeasor under the contract exception in section 13-21-111.6, and the plaintiff then reimburses the insurer for the cost of the treatment.  So although the contract exception prevents the trial court from deducting from the plaintiff's damages the amount paid by a party with whom the plaintiff has contracted, the plaintiff's subrogation obligation will generally prevent double recovery.

*Ronquillo v. EcoClean Home Servs., Inc.*, 2021 CO 82, ¶ 17 (citations omitted).

¶ 123    In light of the contract exception, we agree with Scholle, to the extent that he argues that a court cannot, as a matter of law, reduce damages in excess of the damages cap because a plaintiff owes nothing further with respect to past expenses or bills.

¶ 124    But that is not the same as saying that whether a plaintiff owes money to third-party providers or payers isn't a relevant consideration in deciding to enter judgment in excess of the HCAA's $1 million damages cap.  Otherwise, the language of section 13-64-402(3) — requiring the entry of "judgment in accordance with [a] finding" as to "the amount, if any due [to a] third party payer or provider" — would have little, if any, purpose.  *Dep't of Revenue v. Agilent Techs., Inc.*, 2019 CO 41, ¶ 32 (avoiding a statutory

53

construction that would render a section meaningless); *People v. Gulyas*, 2022 COA 34, ¶ 30 ("We must avoid constructions that would render any words or phrases superfluous."); *Keysight Techs., Inc. v. Indus. Claim Appeals Off.*, 2020 COA 29, ¶ 12 ("A 'cardinal principle of statutory construction' is that no clause, sentence, or word is 'superfluous, void, or insignificant." (quoting *Falcon Broadband, Inc. v. Banning Lewis Ranch Metro. Dist. No. 1*, 2018 COA 92, ¶ 31)).

¶ 125 The trial court did not take subrogation interests (or the lack thereof) into consideration in entering judgment because, it said, none were asserted. But, the defendants insist, "the assumption that [Scholle] was responsible for repaying past medical expenses permeated the trial court's order allowing such a high damage award." To this end, the trial court found (1) "[T]hese [past medical] costs imposed a significant financial burden on [Scholle's] family, for whom he has been the primary income earner. . . . [Scholle] and his family lack the means to earn sufficient income to repay his already-incurred medical costs"; and (2) not allowing a recovery in excess of the cap would "prevent [him] from recovering funds to repay medical care he has already received."

¶ 126    Contrary to one of the trial court's findings, however, Scholle did not produce any evidence that he owed any money to third-party payers or providers.  The trial court, then, should not have taken this "fact" into consideration, much less given it significance in entering judgment, and the court abused its discretion in considering it.  *See City of Duluth*, 785 F.3d at 1210-11; *Medina*, 121 P.3d at 347.

¶ 127    The question at this point is whether the abuse of the court's discretion in this regard was prejudicial or harmless.  *See* C.R.C.P. 61 ("[N]o error or defect in any ruling or order or in anything done or omitted by the court . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.  The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.").  This, in turn, depends on whether the court's error substantially influenced the outcome of the case.  *See Bernache v. Brown*, 2020 COA 106, ¶ 26.

¶ 128  If the record clearly shows that the trial court would have reached the same result even without considering Scholle's liability for past expenses, then the error was harmless. *Cf. People v. Loveall*, 231 P.3d 408, 416 (Colo. 2010) (evaluating the harmlessness of improperly considering a particular ground as a basis for revoking probation).

¶ 129  As we read the trial court's order, the court's improper consideration of Scholle's purported repayment obligations was a significant factor in the decision to allow a judgment in excess of the HCAA's damages cap. We thus can say "with fair assurance that the error substantially influenced the outcome of the case." *See Johnson v. Schonlaw*, 2018 CO 73, ¶ 11. Thus, the court's erroneous consideration of this factor cannot be considered harmless.

¶ 130  The case must be remanded, then, for a re-assessment of whether, under the circumstances, properly considered, there is good cause to believe that the application of the HCAA's damages cap would be unfair.

## D. *Nunc Pro Tunc*

¶ 131   The defendants contend that the trial court erred by failing to enter judgment, as it said it would, *nunc pro tunc* to November 21, 2019, the date the jury returned its verdict.  Instead, it entered judgment nearly ten months later, on September 16, 2020.

¶ 132   The delay in entering judgment, the defendants say, resulted in an additional "ten months of prejudgment interest, increasing the final judgment by nearly $1 million."

¶ 133   "Upon a general or special verdict of a jury, . . . the court shall *promptly* prepare, date, and sign a written judgment and the clerk shall enter it on the register of actions."  C.R.C.P. 58(a) (emphasis added).

¶ 134   A ten-month delay in entering judgment could hardly be called "prompt" action.  *Cf. Keenan ex rel. Hickman v. Gregg*, 192 P.3d 485, 488 (Colo. App. 2008) ("[P]rompt" means "performed readily or immediately; given without delay or hesitation.") (citation omitted). "The doctrine of *nunc pro tunc* permits a court to enter an order, such as an order of final judgment, with an effective date earlier than the actual date of entry.  An entry of judgment *nunc pro tunc* to a certain date is appropriate when the cause was ripe for

57

judgment on that earlier date. The doctrine of *nunc pro tunc* is often used to ameliorate harm done to a party by court delays or clerical errors." *Guarantee Tr. Life Ins. Co. v. Est. of Casper*, 2018 CO 43, ¶ 27; *see, e.g.*, *Zuker v. Clerk-Magistrate*, 673 N.E.2d 548, 552 (Mass. 1996) (A judgment *nunc pro tunc* can be entered "to prevent a failure of justice resulting, directly or indirectly from delay in court proceedings subsequent to a time when a judgment, order or decree ought to and would have been entered, save that the cause was pending under advisement.") (citation omitted).

¶ 135     When a judgment is entered *nunc pro tunc*, postjudgment interest begins to run on the judgment as of the earlier date. *See Stone v. Currigan*, 138 Colo. 442, 449, 334 P.2d 740, 743 (1959).

¶ 136     "Application for . . . a judgment [*nunc pro tunc*] is addressed to the sound discretion of the court." *Perdew v. Perdew*, 99 Colo. 544, 547, 64 P.2d 602, 604 (1936). A court abuses its discretion if its decision is manifestly arbitrary, unreasonable, or unfair, or if it misapplies the law. *AA Wholesale Storage, LLC v. Swinyard*, 2021 COA 46, ¶ 32.

¶ 137     Citing *Estate of Casper*, ¶¶ 26-28, Scholle rather conclusorily asserts that the trial court "could not legally have entered judgment

on verdict day because the verdict did not resolve the damages available under the HCAA." He doesn't tell us why, though. Presumably, it's because the court had yet to determine (1) the amount of applicable prefiling, prejudgment interest, which, as noted earlier, would be part of the damages recoverable under the HCAA; or (2) whether "good cause" existed to allow the jury's award of damages in excess of the HCAA's damages cap. The first of these, however, involved only a matter of mathematical calculation, and the second (unlike in *Estate of Casper*) involved no potential for an increase in allowable damages. Neither of these circumstances would bar the entry of a *nunc pro tunc* judgment.

¶ 138    It is true, as Scholle points out, that much of the ten-month period before the court entered judgment was taken up with post-trial litigation over fees and costs, and collateral source and subrogation issues. But ultimately, none of that affected the base amount of damages awarded by the jury and, in turn, allowed by the court.

¶ 139    Applying a 9% prejudgment interest rate on a base figure of $13,345,931.31,[19] the court (in its written, final judgment) determined that, for the 300 days between the date of the verdict and the date the judgment was entered, Scholle was entitled to "postverdict," prejudgment interest of $987,234.

¶ 140    However, had the court entered its judgment *nunc pro tunc* to the day of the verdict (as the court, at one point, said it would do), the "postverdict" interest on that same base amount for those 300 days would be considered "postjudgment" interest.  Postjudgment interest on money judgments that are appealed is, under section 13-21-101(3), "two percentage points above the discount rate,"

---

[19] As explained in the trial court's written final judgment, this "base" figure comprises

  (1) The jury's $9,292,887 award of damages;

  (2) "pre filing interest" of a simple 9% interest rate on the jury award, running from the date of the surgery to the date that Scholle filed his complaint; and

  (3) "post filing, pre judgment" interest, compounded annually at a 9% rate of the sum of (a) the original jury award plus (b) the pre filing interest, running from the date Scholle filed his complaint to the date the court entered final judgment (on September 16, 2020).

which is the current market interest rate paid to the federal reserve bank of Kansas City, and "rounded to the nearest full percent."

¶ 141 According to the defendants in their reply briefs, the applicable postjudgment interest rate is 2%. Using that rate on the same base figure for the 300 days at issue, the postjudgment interest figure would have been $219,384.

¶ 142 The difference between the figures representing post-verdict, prejudgment interest and post-verdict, postjudgment interest is $767,850.

¶ 143 The court's explanation for not ultimately making the judgment *nunc pro tunc* to the date of the verdict was that the court wanted to enter only one final judgment. But the court could have done so, effective as of the date of the verdict. And by doing so, the court could have alleviated the harm done to the defendants as a result of using a pre-, instead of a post-, judgment rate of interest.

¶ 144 The court's failure to enter judgment *nunc pro tunc*, without a good reason, was, in our view, manifestly unfair and thus an abuse of discretion.

¶ 145    Consequently, the damages part of the judgment must be set aside and re-calculated as if judgment was entered *nunc pro tunc* to the date of the jury's verdict.

## *VII.  Disposition*

¶ 146    The judgment is affirmed in part and reversed in part, and the matter is remanded to the trial court with directions to, consistent with the views expressed in this opinion, (1) reduce the amount of the jury's award for past medical expenses to $5,543,152; (2) re-calculate the amount of prefiling, prejudgment interest and include it, with the jury's award, as damages; (3) reconsider whether Scholle has shown good cause to conclude that application of the HCAA's $1 million damages cap would be unfair; and (4) enter judgment, *nunc pro tunc,* as of the date of the jury's verdict (November 21, 2019).

JUDGE TOW concurs.

JUDGE BERGER concurs in part and dissents in part.

JUDGE BERGER, concurring in part and dissenting in part.

¶ 147  I agree with nearly all the majority's analysis in this difficult case.  But, for two independent reasons, I respectfully disagree that a remand is necessary for a re-assessment of whether to exceed the $1 million cap under the Health-Care Availability Act (HCAA).  *See supra* Part VI.C.  Instead, I believe the trial court's decision was within its broad discretion, and, in any event, any error was harmless.  I would therefore affirm the judgment subject to the specific reductions addressed in the majority opinion.

## I.  The Majority's Analysis

¶ 148  As the majority recites, the trial court relied on six express factors to exceed the cap.  *Supra,* ¶ 112.  The majority agrees that the trial court properly considered five of those factors and that those factors support the trial court's decision to exceed the cap.  *Supra,* ¶ 113.  Nevertheless, the majority reverses the judgment.  The majority says that consideration of *one* of those factors constituted an abuse of discretion.  According to the majority, that one factor requires that we remand this complex case to a new

63

judge (who has no background with the case) for reconsideration of this quintessentially discretionary decision.[1]

¶ 149   The single factor with which the majority takes issue is factor six: the trial court's consideration of the supposed fact that the bulk of these costs were "already-incurred medical costs" and that "Scholle and his family lacked the means to earn sufficient income to pay off those costs." *Supra,* ¶ 112. The majority takes the trial court to task on factor six because it says that Mr. Scholle presented no evidence that he had owed any money to insurers or other third-party payers. *Supra,* ¶ 126. The majority errs for two reasons.

## II.   The Majority's Analysis is Contrary to the Plain Language of the Contract Exception to the Collateral Source Rule

¶ 150   First, the trial court did not abuse its discretion by considering the sixth factor. The contract exception to the collateral source statute required the court to disregard the fact (if it is a fact) that Mr. Scholle or his estate had no out-of-pocket obligations to pay for his past or future medical care.

---

[1] The trial judge who allowed the judgment to exceed the cap has retired.

¶ 151    In tort actions, a court must generally reduce the damages by the amount the plaintiff was compensated by any other person, except that

> the verdict shall not be reduced by the amount by which such person, his estate, or his personal representative has been or will be wholly or partially indemnified or compensated by a benefit paid as a result of a contract entered into and paid for by or on behalf of such person.

§ 13-21-111.6, C.R.S. 2021.

¶ 152    The statute is broad and unambiguous: courts cannot reduce a verdict by any amount paid as the result of a contract.  It contains no exception for when a third party fails to file a subrogation notice under the HCAA with the trial court.  The trial court therefore properly considered Mr. Scholle's medical expenses without regard to insurance when it exercised its discretionary authority to exceed the cap.

¶ 153    The majority claims to distinguish between a prohibited reduction of the judgment based on collateral sources and consideration of the amounts required to be paid by Mr. Scholle or his estate for medical care.  The majority agrees that "a court cannot, as a matter of law, reduce damages in excess of the

65

damages cap because a plaintiff owes nothing further with respect to past expenses or bills." *Supra*, ¶ 123. But, the majority says, "that is not the same as saying that whether a plaintiff owes money to third-party providers or payers isn't a relevant consideration in deciding" whether to exceed the cap. *Supra*, ¶ 124.

¶ 154 In my view, that is a distinction without a difference. The result is precisely the same. The majority reverses a principal judgment of almost $10 million based on monies allegedly paid by Mr. Scholle's insurers and other third-party payers. Regardless of how the majority attempts to sanitize it, that reduction violates the collateral source statute.

¶ 155 Public policy goals of avoiding double recovery may favor the majority. I acknowledge that for years well-meaning people have disputed the public policy grounds supporting both the common law and statutory collateral source rule. *See Wal-Mart Stores, Inc. v. Crossgrove*, 2012 CO 31, ¶¶ 9-18 (explaining the evolution and policy of the common law and statutory collateral source rule).

¶ 156 But the General Assembly has spoken, and our job is to apply the statute, not create a judge-made exception because it may be better policy. "Avoiding the possibility of an undesirable result by

essentially nullifying the [contract exception] would be tantamount to disregarding the legislature's intent." *People v. Weeks*, 2021 CO 75, ¶ 43.

¶ 157    I also acknowledge that the interplay between the HCAA cap provisions and the collateral source rule is not at all clear. But when the General Assembly enacted the HCAA, it did not disturb the contract exception. *See* Ch. 107, sec. 3, § 13-21-111.6, 1986 Colo. Sess. Laws 679; Ch. 100, sec. 1, § 13-64-402, 1988 Colo. Sess. Laws 620. It surely could have, but it did not. We must apply the contract exception as written. "Inartful drafting by the legislature . . . doesn't give us carte blanche to rewrite a statute." *Weeks*, ¶ 38; *see also Prairie Mountain Publ'g Co. v. Regents of Univ. of Colo.*, 2021 COA 26, ¶ 25.

¶ 158    For these reasons, the trial court did not abuse its discretion by considering the sixth factor and allowing the judgment to exceed the cap.

### III.    The Other Five Factors Independently Support Exceeding the Cap

¶ 159    Regardless of who's right concerning the trial court's analysis of the sixth factor, a remand to determine whether to exceed the

cap is not necessary. The majority says it has "fair assurance that the error substantially influenced the outcome of the case." *Supra*, ¶ 129 (quoting *Johnson v. Schonlaw*, 2018 CO 73, ¶ 11).

¶ 160 I disagree. In my view, given the other valid reasons for exceeding the cap, any error by the court regarding factor six did *not* substantially influence the outcome. The first five factors "were proper, supported by the record, and sufficient to support the entry of judgment in excess of $1 million" independent of factor six. *Supra*, ¶ 113.

¶ 161 Most importantly, the jury's award was not based on past medical expenses alone: $2.6 million of the $9 million principal verdict were for *future medical expenses*. *Supra*, ¶ 11, n.3. The trial court relied on this fact as the fifth factor for exceeding the $1 million cap under the HCAA.

¶ 162 Even if Mr. Scholle had no obligation to pay even one dollar to his medical providers for his past medical care, that fact is not dispositive of whether Mr. Scholle had an obligation to pay for part or all of his future medical care. To the contrary, it is purely speculative to assume that Mr. Scholle would *not* bear that cost. It is simply too much to expect the trial court to ascertain with any

certainty the extent to which Mr. Scholle would be liable for future medical costs.

¶ 163    The trial court was therefore well within its authority in inferring that Mr. Scholle would need to pay for his lifetime future medical care (which, according to the jury's award, exceeded the cap by more than $1.5 million).  Accordingly, based on factor five alone, any error regarding factor six did not substantially influence the trial court's decision to exceed the cap.

¶ 164    There are still four other factors on which the trial court relied to exceed the cap.  The court found the amount of the award was supported by the evidence, that it would be fundamentally unfair to limit the damages, that Mr. Scholle carried a significant financial burden, and that he could not return to his chosen career.  *Supra,* ¶ 112.

¶ 165    When these other factors are combined with Mr. Scholle's future medical costs (as determined at the time of trial), there is no doubt in my mind that the trial court would have exercised its authority to exceed the cap in the absence of factor six.

## IV.  Conclusion

¶ 166   For these reasons, I concur in part and respectfully dissent in part.  I concur in all portions of the majority's opinion, except its cap analysis and its disposition in remanding the cap determination to the trial court.